**FEDERATED MUTUAL IMPLEMENT &
HARDWARE INSURANCE CO., a
corporation, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REV-
ENUE, Respondent.**

**No. 16057.**

United States Court of Appeals
Eighth Circuit.

May 4, 1959.

Nicholas S. Kiefer, Chicago, Ill. (Hayner N. Larson, Minneapolis, Minn., was with him on the brief), for petitioner.

George F. Lynch, Attorney, Department of Justice, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., and Lee A. Jackson, and A. F. Prescott, Attorneys, Department of Justice, Washington, D. C., were with him on the brief), for respondent.

Before GARDNER, Chief Judge, and VOGEL and MATTHES, Circuit Judges.

MATTHES, Circuit Judge.

This case is here on petition to review decision of the Tax Court reported in 29 T.C. 262. This court has jurisdiction under Sections 7482(a) and 7483 of the Internal Revenue Code of 1954, 26 U.S.C.A. §§ 7482(a), 7483.

Broadly stated, the controversy is focused upon the amount of foreign tax credit to which the petitioner is entitled for the years 1948 to 1953 inclusive.

Mutual insurance companies, such as petitioner, are subject to special tax treatment. There are three sections of the 1939 Internal Revenue Code, 26 U.S.C.A. applicable herein. *Section 207* provides two alternative tax bases applicable to the type of mutual insurance companies with which we are concerned. "Normal-tax net income," derived from *net investment income*, is taxed at specified normal and surtax rates [§ 207(a)(1)], or "gross amount of income" [interest, dividends, rents, *and net premiums*, minus dividends to policy holders, minus interest which is exempt under § 22(b)(4)],

is taxed at one per cent [§ 207(a)(2)]. The alternative producing the greater tax establishes tax liability [§ 207(a)]. *Section 205* provides that the amount of income, war-profits, and excess-profits taxes imposed by foreign countries shall be allowed as a credit against the tax of a domestic insurance company taxed under Section 201, 204, or 207. The amount of the credit, however, is limited by Section 131. *Section 131(b)(1)* of the 1939 Code, which is the "bone of contention" here, prescribes the formula to be applied in limiting and determining the foreign tax credit. It provides that "(t)he amount of the credit taken under this section shall be subject to each of the following limitations: (1) The amount of the credit in respect of the tax paid or accrued to any country shall not exceed, * * * in the case of a corporation, the same proportion of the tax against which such credit is taken, which the taxpayer's *normal-tax net income* from sources within such country bears to its entire *normal-tax net income* for the same taxable year."[1] (Emphasis added.) Thus, the taxpayer's normal-tax net income from Canadian sources becomes the numerator of the credit-limiting fraction and the taxpayer's entire normal-tax net income becomes the denominator.

Petitioner, a Minnesota corporation, is a mutual insurance company (other than a life or a marine insurance company and other than an interinsurer or reciprocal underwriter). It is authorized to and in fact did transact business throughout the United States and the Dominion of Canada during the period in question and had no income from any source outside those two countries. During all of the six years here involved, petitioner accrued income taxes to the Dominion of Canada on the "underwriting profits" of its Canadian business pursuant to the applicable Canadian laws in effect during those years. The "under-

---

[1] § 131(b) prescribes two limitations on the amount of foreign tax credits, a per-country limitation and an over-all limitation. Since petitioner earned income only in one foreign country, we are concerned only with the per-country limitation found in § 131(b)(1).

writing profits" which formed the basis for petitioner's Canadian income and old age security taxes consisted of the premiums earned in Canada, on the basis of full unearned premium reserve, less claims and expenses incurred in Canada and dividends paid to policyholders in that country. Petitioner was not required by Canadian law or regulations, and in fact did not include in its income tax base any investment income, rents or gains from the sale or exchange of capital assets. The Canadian tax picture, as stipulated and simplified, is as follows:

### Canadian Taxable Income and Tax Paid

(Taxable income in Canada based on "underwriting profits," i. e., excess of premiums earned in Canada over claims, and expenses incurred in Canada, and dividends paid to Canadian stockholders.)

| Year | Taxable Income [1] | Income Tax [2] | Old Age Tax [2] | Tax Rate |
|------|------|------|------|------|
| 1948 | $ 60,645.66 | $ 18,102.73 | | 30% |
| 1949 | 160,909.49 | 45,974.12 | | 33% |
| 1950 | 240,198.01 | 75,992.44 | | 33% to 9/1; 38% after 9/1 |
| 1951 | 149,698.52 | 64,387.49 | | 45.6% |
| 1952 | 305,756.96 | 154,587.43 | $6,183.49 | 50% + 2% old age |
| 1953 | 431,870.61 | 200,925.41 | 8,871.22 | 47% + 2% old age |

[1] Expressed in terms of Canadian money.
[2] Expressed in terms of United States money.

As required by the provisions of Section 207, supra, petitioner computed its United States income tax liability for the years 1948 and 1949 on the second alternative, i. e., on the basis of its gross investment income and net premiums, § 207(a)(2). (This alternative produced the greater tax for those years.) For the remaining years (1950 to 1953 inclusive), petitioner's income tax was computed on the basis of its net investment income, or upon the first of the alternatives, § 207(a)(1). (For those years this alternative produced the greater tax.) Petitioner's income taxable in the United States, as developed from stipulated facts, may be summarized as follows:

### U. S. Taxable Income

| Year | Gross income from all sources [§ 207(a) (2)] | Net (Investment) Income from all sources [§ 207(a) (1)] | | Combined Normal & Surtax Rate Applicable to § 207(a) (1) income |
|------|------|------|------|------|
| 1948 | $ 9,964,421.80 | $251,125.27 | [ 21,178.33]* | 38%** |
| 1949 | 10,621,660.73 | 274,519.85 | [ 37,445.28] | 38%** |
| 1950 | 12,295,834.45 | 304,042.62 | [ 48,404.74] | 42% |
| 1951 | 15,088,636.07 | 327,212.47 | [ 66,104.24] | 50¾% |
| 1952 | 18,114,464.24 | 387,363.73 | [ 92,252.17] | 52% |
| 1953 | 19,813,999.65 | 460,769.92 | [111,759.99] | 52% |

* Figures in brackets represent gross amount of *interest* income attributable to Canadian sources. For taxable years in question, petitioner had no Canadian investment income from dividends, rents, or capital gains.

** For the years 1948 and 1949, petitioner was taxable under § 207(a) (2) at 1% of gross income; for years 1950–1953, petitioner was taxable on its net investment income under § 207(a) (1), at applicable normal and surtax rates.

We now reach the point where the parties fall into disagreement—application of the credit-limiting Section 131(b)(1). Instead of using "normal-tax net income" (investment income) to arrive at a ratio to produce the foreign tax credit, petitioner contends it is entitled to employ the figure representing its net Canadian income, as taxed by Canada (underwriting profits) as the numerator of the fraction, and its normal-tax net income from all sources as the denominator. To illustrate: In its 1948 tax return, petitioner's Canadian income subject to Canadian tax was stated as $60,645.66 and the Canadian tax was stated as $18,193.70. Its reported normal-tax net income (net investment income) from all sources for that year was stated as $251,231.69 [2] Petitioner used $60,645.66 as the numerator and $251,231.69 as the denominator of the credit-limiting fraction, which produced a ratio of 24.139%. The total tax liability to this country in 1948 was $99,700.87. This figure multiplied by the ratio of 24.139% produced a product well in excess of the actual tax paid to Canada, thus petitioner claimed the full amount of the Canadian tax, $18,193.70, as a credit. The Tax Court found that the formula adopted by petitioner was contrary to the statute, Section 131(b)(1) and deficiency assessments resulted.

Determination of the basic question, i.e., the amount of foreign tax credit to which petitioner is entitled, turns upon the meaning of credit-limiting Section 131(b)(1) of the 1939 Code. Commissioner takes the position that the term "normal-tax net income" as used in that section is limited to net investment income, and that in computing the amount of the foreign tax credit, for all of the years involved, and regardless of the United States tax basis, petitioner's net investment income from sources without the United States, in this case Canada, becomes the numerator of the credit-limiting fraction and its entire net investment income from all sources (United States and Canada) becomes the denominator. While conceding in its brief that "(b)y sections 207(b)(4) and 13(a) 'normal-tax net income' is in substance net investment income, with certain adjustments not presently material, (a)nd by sections 205 and 131(b), the total credit for foreign income taxes paid may not exceed that proportion of the United States tax which the taxpayer's 'normal-tax net income' from Canadian sources is of all its 'normal-tax net income,'" petitioner nevertheless insists that we should not adhere to the literal wording of the statute, but should construe it so as to bring about the purpose which motivated Congress in enacting the legislation.[3] More precisely, petitioner contends that "(t)he sole purpose of the limitation was to eliminate such portion of the credit, if any, as was attributable to higher tax rates than those prevailing in the United States."

From legislative history, we recognize that in providing for corporate foreign tax credit, Congress was primarily attempting to "mitigate the evil of double taxation," and, incidentally endeavoring to encourage and facilitate corporate foreign enterprise. This was the pronouncement of the Supreme Court in Burnet v. Chicago Portrait Co., 285 U.S. 1, 52 S.Ct. 275, 76 L.Ed. 587, wherein the predecessor of Section 131 of the 1939 Code [§ 238, Revenue Act of 1921] was considered, and in which the history of the legislation was fully explored. See also, American Chicle Co. v. United States, 316 U.S. 450, 451, 62 S.Ct. 1144, 86 L.Ed. 1591, and Annotations, 12 A.L.R.2d 359, 363; 134 A.L.R. 1433, 1434.

2. The printed record before us contains only the tax returns for 1948. We recognize the discrepancy between the figures on that return and the stipulated figures appearing in the tables set out above. These may be attributable to conversion exchange rates or later adjustments.

3. Petitioner admits that "[t]he language of the foreign tax credit limitation statute taken literally favors the respondent's position."

As to this "evil of double taxation," we pause to consider its nature. Double taxation, although not favored, is permissible in the absence of express or implied constitutional prohibition. 84 C.J.S. Taxation § 40. (The 14th Amendment does not forbid double taxation. Illinois Cent. R. Co. v. State of Minnesota, 309 U.S. 157, 60 S.Ct. 419, 84 L.Ed. 670; Fort Smith Lumber Co. v. State of Arkansas, 251 U.S. 532, 40 S.Ct. 304, 64 L.Ed. 396.) Further, even a brief survey of the law in this area makes it clear that we are here dealing with what we prefer to call duplicate taxation, and not with the problem of "double taxation" in the prohibited sense. See 84 C.J.S. Taxation § 39, pp. 131, 132:

> "It has been said that there is much room for discussion and difference of opinion as to what really amounts to double taxation. * * * In order to constitute double taxation in the objectionable or prohibited sense the same property must be taxed twice when it should be taxed but once; both taxes must be imposed on the same property or subject matter, for the same purpose, *by the same state, government, or taxing authority*, within the same jurisdiction or taxing district. * * * and they must be the same kind or character of tax." (Emphasis supplied.)

See also 51 Am.Jur., Taxation, § 284. We discuss this distinction only for the purpose of pointing up the precise nature of § 131(b). Prior to 1918, domestic corporations, taxed by the United States on all income, foreign, as well as domestic, were entitled to no credit for foreign tax payments against the tax due to the United States.[4] Congress acted in 1918 to alleviate this situation when the predecessor to § 131 of the 1939 Code was enacted. [Revenue Act of 1918, § 238, 40 Stat. 1057.] See § 33.01, Vol. 5, Mertens Law of Federal Income Taxation, Zimet & Ness Revision; Annotations, 134 A.L.R. 1433, 1434, 12 A.L.R.2d 359. With the foregoing in mind, we are in accord with the view that allowance of deductions or credits in respect to taxes paid to other sovereigns, is a privilege and a matter of Congressional grace. See Burroughs Adding Mach. Co. v. Terwilliger, 6 Cir., 135 F.2d 608; Keasbey & Mattison Co. v. Rothensies, 3 Cir., 133 F.2d 894, certiorari denied, 320 U.S. 739, 64 S.Ct. 39, 88 L.Ed. 438; Omega Chemical Co. v. Commissioner, 31 B.T.A., 1108, 1114; George W. Helme Co. v. United States, 23 F.Supp. 787, 87 Ct.Cl. 474, certiorari denied 305 U.S. 645, 59 S.Ct. 145, 83 L.Ed. 417. But cf. Gentsch v. Goodyear Tire & Rubber Co., 6 Cir., 151 F.2d 997. In extending this foreign tax credit through the Revenue Act of 1918, no limitation was set on the amount. However, it soon became obvious that some limitation was necessary in order to protect the domestic revenue, for to the extent that the foreign tax rate exceeded the domestic rate, the taxpayer would enjoy benefits of tax credits against taxes accruing solely on domestic income. Thus the provisions now found in § 131(b) were incorporated in the Revenue Act of 1921, C. 136, 42 Stat. 227, §§ 222, 238. See Anno., 134 A.L.R. 1446, and Omega Chemical Co. v. Commissioner, 31 B.T.A. 1108, 1114, where the Tax Court pointed out the necessity of such limits.

As we view the situation, the seeming difficulty in resolving this controversy centers around and stems from three factors apart from the clear and unambiguous language of Sec. 131(b)(1); first—mutual insurance companies, such as petitioner, have been set apart for particular tax treatment, in that they are taxed

---

4. Allowance of a credit must be distinguished from relief given through allowance of an expense deduction for taxes paid in arriving at net taxable income. See § 23(c) (1) (C), I.R.C.1939, 26 U.S. C.A. § 23(c) (1) (C). Early Federal tax laws allowed only a deduction in computing net taxable income. By § 131 and its predecessors, taxpayers generally have an alternative choice. However, it is pointed out that § 207, under which petitioner's tax liability is computed, does not provide for deduction of such taxes in arriving at taxable income.

from year to year on alternative bases, i.e., net investment income, or overall gross income, including net premiums, depending upon which computation produces the higher tax figures. Second, the credit limiting formula, in clear language, directs that the credit ratio be determined on the basis of "normal-tax net income," which by definition means net investment income, [§ 207(b)(4)], as petitioner concedes. There is no provision calling for variations of this formula in order to accord with the actual United States tax base. Third, the Canadian tax base, being founded on "underwriting profits," differs in kind from the United States tax base and remained stationary for the tax years here in question. The result of these three components is that in some years (here-1948, 1949), petitioner is being taxed in part by two different sovereigns on the same income (net premiums), or there is to that extent, duplicate taxation. On the other hand, for the years 1950–1953, when petitioner is taxed in the United States on its net investment income, there is in fact complete absence of *any* duplicate taxation, for as we have seen, Canada does not impose a tax upon petitioner's investment income. However, as the Tax Court pointed out in its opinion, the Commissioner does not contend that taxpayer is entitled to no credit on that basis for the years 1950–1953, and we observe that § 131(b) is not expressly made to depend upon the presence of duplicate taxation. See and compare L. Helena Wilson v. Commissioner, 7 T.C. 1469; Helvering v. Campbell, 4 Cir., 139 F.2d 865; Dexter v. Commissioner, 47 B.T.A. 285.

Despite the unusual factual situation existing here, we cannot subscribe to the view that literal application of § 131(b) defeats the purpose for which it was enacted. As to the years 1950–1953, when petitioner was taxed upon the net investment income base, no logical contention may be made that, with net investment income as the denominator, the numerator may vary in kind. As to the years of 1948 and 1949, when petitioner was in

fact taxed upon its gross income, including by definition, net underwriting profits, it may seem illogical that for the purposes of figuring the credit-limiting ratio, resort must be had to net investment returns, but that is the plain meaning of § 131(b). The Ninth Circuit was faced with a similar problem in Northwestern Mut. Fire Ass'n v. Commissioner, 181 F.2d 133, 135, where the mutual insurance company had been taxed upon the alternative basis of "gross amount of income" under § 207(a)(2) for the years in question. In holding that the credit limitation must be geared to "net investment income," rather than to a "gross income ratio," the court observed, at page 136:

"Taxes imposed upon petitioner by the United States for the years 1942 and 1943, were based not upon its normal-tax net income, but solely upon the alternative basis—'gross amount of income' * * * In view of that fact limitation of foreign-tax credits by a ratio of normal-tax net income appears to have no logical basis. But as legislative history reveals, mutual insurance companies such as petitioner present unusual problems of tax administration. Resolution of those problems has been made, if empirically, by the Congress. Our function is at an end when we have determined the scope of congressional action."

Helvering v. Campbell, 4 Cir., 139 F.2d 865, relied upon by petitioner, is dissimilar on the facts, and carries no persuasion here. Although taxpayer there was allowed credits for foreign taxes paid on income which was in fact not taxed in the United States, this result was reached through strict application of the clear meaning of the statute. See also Dexter v. Commissioner, 47 B.T.A. 285, where the statute was literally and strictly applied.

To say that the denominator of the credit limiting fraction, as well as the numerator, should vary from year to year, according to the alternative tax base (as contended in Northwestern Mu-

tual Fire Ass'n v. Comm'r, supra), or to say that the numerator may differ in kind from the denominator (as petitioner here contends), thereby giving it the utmost benefit of credit for taxes paid to foreign countries, would do violence to the plain wording of the statute, and carry us far afield into the wilderness. It must be remembered that § 131 is designed to apply to all business corporations and is in no way tailored to meet the peculiar tax status of mutual insurance companies. In our view, Congress has endeavored to set up a workable formula for determining the limitations, which would be fair and applicable to all situations. The relief afforded is a matter of grace and privilege, and taxpayer is in no way entitled as a matter of right to full credit for all taxes paid to foreign countries. This may of necessity result in some duplicate taxation, and there may be inequities or eccentric results. If taxpayers, such as petitioner, find themselves aggrieved, it is for them to address themselves to Congress for further relief. Cf. Abbot Laboratories International Co. v. United States, D.C. N.D.Ill., 160 F.Supp. 321, appeal pending.

The decision of the Tax Court is affirmed.