## In re TAX REFUND LITIGATION.

### No. MDL 87–731 (TCP).

United States District Court,
E.D. New York.

March 29, 1991.

As Amended May 24, 1991.

Silverstein & Osach by Nathan Silverstein, New Haven, Conn., for plaintiffs Bellof, Gold, Barrister Associates and Chadwick Investor Services, Inc.

Kostelanetz, Ritholz, Tigue & Fink by Jules Ritholz, New York City, for plaintiffs Townsend and Universal.

U.S. Dept. of Justice, Tax Div. by Harold Sklar, Washington, D.C., for defendant.

## MEMORANDUM AND ORDER

PLATT, Chief Judge.

By jury verdict rendered July 11, 1990, the seven plaintiffs were found to have promoted an abusive tax shelter and thus to be liable for the penalty prescribed by I.R.C. § 6700 (1982). By agreement of the parties, this Court will now determine the correct amount of the penalty owed by each of the plaintiffs.

*Facts*

The tax shelter promoted by the plaintiffs centered around the purchase and subsequent leasing of what the parties have referred to as "book properties." In broad brush, it was structured in the following manner. Plaintiff Geoffrey Townsend Ltd. ("Townsend") purchased certain book properties, that is, the plates, films, computer discs and other equipment which are used in the printing of hard and soft cover books, from various book publishers in 1982. It paid for the properties with small cash down payments and larger recourse notes at a rate of 9% per annum. At trial, it was established that the purchase price vastly exceeded the fair market value of the book properties.

Later in 1982, Townsend leased its book properties to 35 limited partnerships. The individual limited partnerships oversaw the production and distribution of the books produced using the book properties. For their investment, the limited partners were

promised certain tax advantages: a deduction for the lease payments, and a proportionate share of the investment tax credit, based upon the inflated purchase price, which Townsend elected to pass through to its lessees.

In 1983, plaintiff Universal Publishing Resources, Inc. ("Universal") essentially repeated the actions of Townsend in the previous year. It purchased book properties on the same terms as Townsend, then leased them to 65 limited partnerships and elected to pass through the investment tax credit.

Plaintiff Barrister Associates ("Barrister"), a New York general partnership, was the general partner in all of the limited partnerships which leased book properties from Universal and Townsend. For its services, it collected substantial general partner fees. Plaintiffs Paul Belloff and Robert Gold are the sole general partners of Barrister Associates. Plaintiff Chadwick Investor Services, Inc. (a/k/a Chadwick Securities Corp.) ("Chadwick") is a company which the limited partnerships employed as an agent in selling limited partnership interests. Plaintiff Madison Library, Inc. provided administrative and clerical services to Universal and Townsend.

In 1986, the IRS determined that this series of transactions constituted the promotion of abusive tax shelters and assessed the following penalties against each of the plaintiffs:

| | |
|---|---|
| Townsend | $2,739,013 |
| Universal | $5,399,811 |
| Madison Library | $ 400,000 |
| Barrister | $5,306,000 |
| Belloff | $5,306,000 |
| Gold | $5,306,000 |
| Chadwick | $5,211,000 |

The penalties against Universal and Townsend were computed as a percentage of the gross income each entity derived from its promotions. The penalties against Barrister, Belloff, Gold and Chadwick were computed based upon the theory that each act of organizing a limited partnership and each sale of a limited partnership interest

constituted a separate violation of the statute justifying the imposition of a separate $1000 penalty.

In February 1987, pursuant to I.R.C. § 6703 (1982), the plaintiffs paid 15% of these assessments and filed this refund action. The Government brought a counterclaim seeking payment of the remaining 85% of the assessed penalty. By Memorandum and Order dated November 2, 1988, this Court rejected the government's theory regarding the imposition of multiple $1000 penalties and directed that the penalties be reassessed. *See In re Tax Refund Litigation*, 698 F.Supp. 439, 443–44 (E.D. N.Y.1988). On July 24, 1989, the IRS assessed the following penalties against each of the plaintiffs:

| | |
|---|---|
| Townsend | $4,395,925 |
| Universal | $8,994,367 |
| Madison Library | $ 400,000 |
| Barrister | $ 534,693 |
| Belloff | $ 124,672 |
| Gold | $ 124,672 |
| Chadwick | $1,446,713 |

The increase in the penalties assessed against Universal and Townsend resulted from a change in the theory upon which the Government computed their gross income. The penalties assessed against the remaining plaintiffs were now computed as a percentage of the gross income each derived from the promotions.

*Discussion*

As it existed at the time the events in question occurred, section 6700 required promoters of abusive tax shelters to "pay a penalty equal to the greater of $1,000 or 10% of the gross income derived or to be derived by such person from such activity." I.R.C. § 6700(a) (1982).[1] Because the Government has now chosen to calculate all of the penalties as a percentage of the gross income each plaintiff derived, in their post-trial memoranda the parties dispute whether certain items were properly included in the government's calculation of that gross income.

---

1. The percentage penalty was thereafter raised to 20% of the gross income derived from the promotion. See Tax Reform Act of 1984, Pub.L. No. 98–369, § 143(a), 98 Stat. 494, 682 (1984). The penalty has since been changed again. See 26 U.S.C.A. § 6700 (Supp.1990).

## A. General Matters

### 1. *Variance Doctrine*

■ Before considering each plaintiff's specific objections to the IRS' computation of its gross income derived from the tax shelters, we first must confront two general arguments presented by the Government which are applicable to all plaintiffs. First, the Government seeks to erect the so-called variance doctrine as a bar to certain arguments made by the plaintiffs with regard to the calculation of their gross incomes. In brief, the variance doctrine prevents a taxpayer from raising issues or claims in a refund action before the district court, if it has not previously raised them in its administrative claim filed with the IRS. *Real Estate–Land Title & Trust Co. v. United States*, 309 U.S. 13, 17–18, 60 S.Ct. 371, 373, 84 L.Ed. 542 (1940); *United States v. Felt & Tarrant Mfg. Co.*, 283 U.S. 269, 272, 51 S.Ct. 376, 377, 75 L.Ed. 1025 (1931).[2] The doctrine is designed to promote thorough administrative investigation of claims by ensuring that the IRS gets a sufficiently detailed claim. *United States v. Memphis Cotton Oil Co.*, 288 U.S. 62, 70–72, 53 S.Ct. 278, 281–282, 77 L.Ed. 619 (1933). It also provides the IRS with notice of all claims and thus prevents factual surprise at trial. *Mayer v. United States*, 285 F.2d 683, 685–86 (9th Cir.1960).

■ Two factors present in this case render application of the variance doctrine inappropriate. First, it was not until well after the plaintiffs first filed their refund claims that the IRS adopted its present, modified calculation of the penalty owed by each. Moreover, the IRS not only altered its calculation of the penalties but it did so based upon a modification in the theory upon which the penalties were calculated. Given the IRS' change of position, this Court may not seriously entertain the argument that it should bar plaintiffs from advancing new arguments to address the IRS' changed computation and theory because those arguments were not contained in a claim filed with the IRS before the

Government reversed its field. Furthermore, there is no chance of the sort of factual surprise or surprise at trial which the variance doctrine was intended to avoid. Trial has concluded and the facts are firmly established. This Court will therefore entertain all arguments made by the plaintiffs regarding the computation of their gross income.

### 2. *Allocation of Burden of Proof*

Second, the government contends that the plaintiffs must bear the burden of proof with regard to any reduction in the IRS' penalty assessment. It arrives at this conclusion by arguing that IRS assessments are presumptively correct and can be rebutted only through the introduction of competent and relevant evidence to the contrary. *Welch v. Helvering*, 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933); *Valley Title Co. v. Commissioner*, 559 F.2d 1139, 1141 (9th Cir.1977). In a penalty assessment, it argues, this presumption extends to two issues: 1) whether the person against whom the penalty is assessed is liable for the penalty and 2) the amount of the penalty assessed. In the case of section 6700 penalties, the government concedes that this allocation of burdens is partially modified. Section 6703 prescribes the procedures to be followed in the assessment of section 6700 penalties and specifically states that "[i]n any proceeding involving the issue of whether or not any person is liable for a penalty under section 6700 … the burden of proof with respect to that issue shall be on the Secretary." I.R.C. § 6703(a) (1988) (emphasis added). Because section 6703(a) explicitly assigns the burden of proof to the Government only on this issue, the Government concludes that the plaintiffs retain the burden of proof with respect to the amount of the penalty.

The plaintiffs respond that the presumption relied upon by the government applies only in cases where the IRS has assessed a tax deficiency and may not be applicable

---

**2.** Because the plaintiffs were required to file such a claim only in connection with the 15% they had actually paid, this argument only applies to their refund action. It cannot apply to the Government's counterclaim seeking recovery of the remainder of the assessed penalties.

here. Not only does this case not involve a tax deficiency, they argue, but section 6703(b) specifically states that deficiency procedures do not apply to the assessment of section 6700 penalties. *Id.* § 6703(b). Further, they point out that one district court has held that the Government bears the burden of establishing the plaintiff's gross income. *See Weir v. United States,* 716 F.Supp. 574, 580–81 (N.D.Ala.1989).[3]

█ Far from twisting the language of section 6703(a), as the plaintiffs contend, the Government's construction is faithful to the plain language of the statute. It is well-settled that the penalty assessments of the IRS are generally presumed to be correct and that the plaintiff *in a refund action* bears the burden of proof in challenging such an assessment. *Welch, supra,* 290 U.S. at 115, 54 S.Ct. at 9. The parties do not dispute that section 6703(a) alters this allocation of burdens with respect to the conduct creating liability for section 6700 penalties. As the Government aptly points out, the plain language of section 6703(a), however, indicates that this alteration is a limited one. The section places upon the IRS the burden of establishing only that the plaintiffs' conduct renders them liable for a civil penalty.

It must be conceded that in many cases this allocation would not result in a split allocation of burdens, but would place the burden of proof on all relevant issues squarely on the shoulders of the Government. Most of the penalty provisions to which section 6703(a) applies impose fixed dollar penalties upon each violation of the statute. *See id.* §§ 6700–6702. Therefore, in many cases, it would be unnecessary to consider the burden of proof with respect to the amount of the penalty. Rather,

proof of liability would subsume proof of the amount of the penalty.[4]

The fact that often proof of liability would include proof of the amount of liability, however, does not dictate that the burden of proof with respect to both issues must always lie with the Government. The penalty imposed by section 6700 is considerably more complicated than that imposed by its companion sections: violators must pay a penalty equal to the greater of $1000 per violation or a stated percentage of the gross income derived from the violation. *Id.* § 6700(a). Clearly, in certain cases, the issue of the amount of the plaintiff's gross income derived from the promotion would remain in section 6700 cases even after liability had been established. In drafting this provision, Congress must have anticipated that this would be the case and yet, in assigning the burdens of proof in the refund action created by section 6703, it required the government to prove only that the plaintiff was liable for the penalty.[5]

█ Moreover, this Court can think of no policy considerations which require that the Government bear the burden of proof on both issues. Rather, the Government having shouldered the considerable burden of proving to a jury that the plaintiffs have promoted abusive tax shelters, this Court can conceive of no reason to justify upsetting the customary allocation of the burden of proof in penalty assessments. Once it establishes liability under section 6700 and the only remaining issue is the amount of gross income derived by the plaintiff, there is simply no reason to regard the IRS calculation of the plaintiffs' gross income with any more suspicion than one might in the case of a penalty based upon a tax deficien-

---

**3.** The court in *Weir* reached this conclusion without setting forth the reasoning which underlay it. Not having the benefit of that reasoning, this Court must respectfully disagree with its conclusion.

**4.** If, for instance, three violations of section 6701 were established, a penalty of $3,000 would have to be imposed. *See id.* § 6701(b)(1).

**5.** The current version of section 6700 also allocates to the plaintiff the burden of establishing

the amount of the gross income it derived from the prohibited activity. Under it, the Government is entitled to a $1000 per violation penalty, but the plaintiff may reduce that amount if it can prove that the gross income it derived from the venture was less than that amount. See 26 U.S.C.A. § 6700 (Supp.1990). While obviously not dispositive, the fact that Congress now clearly thinks it appropriate to assign this burden to the plaintiff is some indication that it had the same allocation in mind when it originally drafted section 6703.

cy. The same policies which support this allocation in ordinary penalty cases are equally applicable in this situation. *See generally,* Martinez, *Tax Collection and Populist Rhetoric: Shifting the Burden of Proof in Tax Cases,* 39 Hast. L.J. 239, 266–72. (1988). Perhaps most importantly, it is the plaintiffs and not the IRS who are most likely to possess the information necessary to determine the gross income derived from the abusive shelters upon which the calculation of the penalty is based.

It cannot avail the plaintiffs to argue that this allocation of burdens is peculiar to tax deficiency actions and thus inapplicable in this case where no deficiency is alleged. First, as outlined above, once liability is established, the same policies which underlie the allocation of the burden to the taxpayer in the case of deficiency assessments justify allocation to the plaintiff of the burden of disproving the Government's calculation of their gross income here. Second, contrary to plaintiffs' assertions, section 6703(b) does not dictate that the government bear this burden. Section 6703(b) merely indicates that the procedures outlined in Subchapter B of Chapter 63 of the Internal Revenue Code do not apply to the assessment of section 6700 penalties. *See* I.R.C. § 6703(b) (1988). Subchapter B of Chapter 63, however, does not direct that the taxpayer bear the burden of disproving IRS deficiency assessments. Rather, it defines deficiencies and sketches the procedures to be followed in challenging them before the Tax Court. *See id.* §§ 6211–6216. Furthermore, the legislative history of section 6700–6703 reveals that section 6703(b) was not intended to reverse the allocation of the burden of proof in cases where a deficiency is found. It was, instead, intended to allow the IRS to assess section 6700 penalties without prior review by the Tax Court and to relieve those whom the IRS determined were liable for such penalties of the requirements that they first seek review of that determination in the Tax Court and pay any penalty assessed in full before being permitted to challenge it directly in the district courts. *See* S.Rep. No. 494, 97th Cong., 2nd Sess. at 270, *reprinted in* 1982 U.S.Code Cong.

& Admin.News 781, 1017. Thus, section 6703(b) does not require that the Government, as opposed to the plaintiffs, bear the burden of proving the amount of the penalty to be paid by the plaintiffs.

**B. Plaintiffs' Specific Challenges to the Penalty Assessments**

The plaintiffs challenge the IRS's calculation of their gross income on various grounds. Those challenges will be dealt with serially, in the order in which they were raised in the plaintiffs' briefs.

**1. *Belloff and Gold***

**a. Imposition of Double Penalty**

The gross income base upon which the Government calculated the penalties against Belloff and Gold consists entirely of income each man derived from Barrister, a partnership of which each is a general partner, and Chadwick, a subchapter S corporation in which each was a one-third shareholder. In addition to the penalties assessed against Belloff and Gold, the Government has also assessed penalties against Barrister and Chadwick equal to 10% of the gross income each derived from its participation in the promotion. Because they feel the burden of both sets of penalties will fall upon them individually, Belloff and Gold now argue that imposition of penalties upon them individually, as well as upon the partnership and the subchapter S corporation constitutes an impermissible double penalty. Based upon this argument, they seek a total abatement of the penalties assessed against them as individuals.

*i. Income Received from Barrister Associates*

In support of its assessments against both Barrister and its partners, the Government offers a strict reading of the statute. Section 6700, it argues, imposes a penalty upon any "person" who is found to have made a "gross valuation overstatement" or a false or fraudulent statement as to any tax benefit which may be derived from the suspect arrangement. *See* I.R.C. § 6700 (1982). The standard definition of "per-

son," applicable to the whole of the Code, contained in section 7701(a)(1), includes "partnership[s]" as well as "individual[s]." *Id.* § 7701 (1988). Thus, because the jury found Belloff, Gold and Barrister liable for the section 6700 and because the definition of "person" includes both an individual and a partnership, the Government feels it is entitled to assess the penalties it has against all three plaintiffs.

The parties have not directed the Court to any authority which deals expressly with the permissibility of a double imposition of penalties and it has not located any.[6] Given the fact that the penalties at issue here are tax penalties, however, the law relating to double taxation provides some guidance.

■ To determine whether a statute imposes an impermissible double tax requires a two step analysis. First, it must be determined whether the taxes at issue constitute a "double tax." To do so,

> the same property must be taxed twice when it should only be taxed once; both taxes must be imposed on the same property or subject matter, for the same purpose, by the same state, government, or taxing authority, within the same jurisdiction or taxing district.... and they must be the same kind or character of tax.

*Federated Mutual Implement & Hardware Ins. Co. v. Commissioner,* 266 F.2d 66, 70 (8th Cir.1959). Even if a double tax is imposed, however, it will not be per se impermissible. Rather, a double tax will be upheld so long as Congressional intent to impose it is clear. *United States v. Hemme,* 476 U.S. 558, 572, 106 S.Ct. 2071, 2079, 90 L.Ed.2d 538 (1986); *Hellmich v. Hellman,* 276 U.S. 233, 238, 48 S.Ct. 244, 246, 72 L.Ed. 544 (1928). Thus, the second stage of the analysis requires an examination of the statute and the legislative histo-

ry to determine whether such Congressional intent can be divined. In the course of this analysis, it must be remembered that double taxation is disfavored and, for our purposes, that statutes creating penalties are to be strictly construed.

■ Given these rules, this Court is of the opinion that imposition of section 6700 penalties on both the gross income derived by Barrister and the gross income derived by Belloff and Gold constitutes a double penalty. Both penalties were assessed by the IRS, pursuant to the same section of the Code, for the same conduct, on the same people and for the same underlying policy reasons. Finally, they fall squarely upon the same individuals. Contrary to the assertions of the government, a partnership is not a legal entity separate from its partners under New York law, *Ruzicka v. Rager,* 305 N.Y. 191, 196, 111 N.E.2d 878, 880–81 (1953), or under the Code, *see* I.R.C. § 702 (1988) (partnership not a separate taxable entity); *Guaranty Employers Ass'n v. United States,* 241 F.2d 565, 572 (5th Cir.1957). As partners, Belloff and Gold are jointly and severally liable to the full extent of their assets for any penalty imposed upon the partnership. N.Y. Partnership Law §§ 24, 26 (1990). Additionally, the partnership is fully liable for any penalty incurred by one of the partners, if that partner acts within the scope of his authority. *Id.* § 24. Thus, any penalty assessed against Barrister must necessarily fall upon Belloff and Gold personally and any penalty imposed upon the individual partners must fall upon Barrister. In either case, the penalty will be satisfied out of the same assets, those of the partners. Both legally and economically, therefore, there is no difference between imposing a penalty upon a partnership and imposing a penalty on the partners of the partnership for authorized conduct. Although in form as-

---

**6.** The Government cites a series of cases which indicate that partnerships may indeed be liable for federal tax penalties. See *Donelan Phelps & Co. v. United States,* 681 F.Supp. 615 (E.D.Mo. 1987); *National Commodity and Barter Association v. United States,* 625 F.Supp. 920 (D.Colo. 1986); *Calvey v. United States,* 448 F.2d 177 (6th Cir.1971); *Lesher v. United States,* 440 F.Supp. 372 (N.D.Ind.1977); *In re McManis,* 87–1 U.S.

T.C. ¶ 9114 (D.Ky.1987). Together, these cases stand for the proposition that the government may assess a *single* penalty against both partners and a partnership jointly. Not one, however, suggests that both partners and the partnership may simultaneously be assessed separate penalties based upon the same act or conduct.

sessments against separate entities, in substance the penalties imposed upon Barrister, Belloff and Gold will fall upon the same assets and the same people.

Because they constitute a double penalty, reduction of the assessments is warranted unless Congress has manifested a clear intent that such a double penalty be imposed. Examination of the text of the Code and the legislative history of sections 6700, however, reveals no such clear indication. The Government might argue that such an intent is clear from the text of the statute. Specifically, because Congress imposed section 6700 penalty upon any "person" who engaged in the conduct the section prohibits, and the terms can include both "individuals" and "partnerships," the section could be said to authorize simultaneous separate penalties for each. After examining both provisions, this Court may not agree with this reading of them.

■ Section 6700 provides that "Any person who [violates the provisions of this section] shall pay a penalty...." *Id.* § 6700. Section 7701(a)(1) provides that "The term 'person' shall be construed to mean and include an individual, a trust, estate, partnership, association, company or corporation." I.R.C. § 7701(a)(1) (1988). As this court reads these two provisions, implicit in them is the understanding that any one entity may constitute no more than one "person" for purposes of section 6700 penalties. Although an alternative reading is possible, the law favors the narrow construction of penalty statutes and particularly disfavors interpretations which might result in a double penalty. Most significantly, this court feels that the broader construction offered by the government is inconsistent with a common sense understanding of these provisions. In this Court's estimation, the broad and inclusive range of organizational forms set out in section 7701(a)(1) reflects Congress' intent to subject as many different organizations as possible to the provisions of the Code.

It does not also reflect a desire to create multiple exposures for particular entities which happen to fit within two of the categories it enumerates. Absent a clearer indication, this Court may not conclude that the text of section 6700 indicates that a single entity may simultaneously constitute two separate "persons" for purposes of imposition of the penalty.

Nothing in the legislative history of section 6700, moreover, indicates that Congress intended to impose such a double penalty upon the assets of tax shelter promoters who operate in an organizational form which happens to fit into more than one of the categories outlined in section 7701(a)(1). Indeed, there is no suggestion that Congress thought that any specific organizational form was particularly pernicious or that the form taken by the promoter was significant in any way. Rather, Congress was concerned only to penalize those who organize and sell such shelters and to deter them from engaging in such conduct. *See* S.Rep. No. 494, 97th Cong., 2nd Sess. at 266, *reprinted in* 1982 U.S. Code Cong. & Admin.News 781, 1014. It expressed no additional desire to channel the activities of promoters away from particular forms of organization.

Thus, neither the text nor the legislative history of section 6700 clearly indicate that Congress sought to impose a double penalty upon tax shelter promoters who act in the form of a partnership. The Government's interpretation of the section would, therefore, impose an impermissible double penalty and may not be upheld. Insofar as they are attributable to gross income received from Barrister, therefore, the penalties assessed against Belloff and Gold must be abated.[7]

### ii. Income Received from Chadwick

■ Applying the same analysis to the income each plaintiff received from Chadwick, it is apparent that the imposition of

---

**7.** Belloff and Gold also challenge the inclusion in their gross income of certain amounts received from Barrister prior to the effective date of section 6700 and certain Keogh contributions made by Barrister on their behalf. Because none of the income either received from Barrister may be included in their gross income for purposes of the penalty calculations, this Court will not address those claims.

penalties on both Belloff and Gold and Chadwick does not constitute a double penalty. Chadwick is a subchapter S corporation which, although it may receive favorable tax treatment under the Code, is still legally an entity separate from its shareholders. Moreover, as shareholders, Belloff and Gold are not individually liable for penalties imposed upon Chadwick, nor is Chadwick responsible for penalties imposed upon Belloff and Gold. Thus, the penalties imposed upon Belloff and Gold may not be reduced on this basis.

b. Transfer of Ownership of Chadwick

Belloff and Gold claim that the Government incorrectly included in their gross income for the year 1984 $190,552.33 of cash withdrawals from and Keogh Plan contributions made by Chadwick, a sub-chapter S Corporation. Each Plaintiff acknowledges that he was a one-third shareholder in Chadwick during 1983, but both claim that they transferred their interests in the corporation to their respective wives in late 1983.

In disputing these contentions, the Government relies principally upon the fact that the plaintiffs bear the burden of disproving its assessment. Specifically, it argues that Belloff and Gold cannot have met this burden because they have introduced no evidence establishing the exact date of the transaction, the consideration paid for the stock, or the amount of monies received by Mrs. Belloff and Mrs. Gold during 1984. In the absence of such evidence, it feels the income produced by Chadwick during 1984 must be attributed to plaintiffs. Furthermore, it argues that even if plaintiffs have met their burden of proof regarding the transfer, the amount of the income received by their wives should nevertheless be included in their gross income, because it was produced by section 6700 activity and received under their "stewardship" of Chadwick.

■ It is clear that plaintiffs have met their burden of proof with respect to the fact and date of the transfer of the stock. The schedules K–1 attached to the Chadwick tax return for 1984 state that Mrs.

Belloff and Mrs. Gold were stockholders in Chadwick in 1984. More importantly, however, Ronald Cohen, the President and third shareholder of Chadwick testified that the transfer had occurred in "late 1983." (Tr. 4160). He recalled that he had specifically ordered this transfer because Belloff and Gold had each received notice that they were the subject of a government investigation. *Id.* The Government offered no evidence contradicting Cohen's testimony or suggesting that transfers occurred at a later date. Moreover, Cohen's credible explanation of the rationale underlying the transfers effectively undermines that contention that these were sham transactions designed to defraud the IRS.

■ The Government's argument that the monies received after this transfer must nevertheless be included in Belloff's and Gold's gross income because it was derived from the section 6700 activity of an entity under their stewardship must be rejected. At the time of the events in question, the penalty imposed upon "persons" who violated section 6700 was computed as a percentage of the gross income "derived by such person from such activity." I.R.C. § 6700 (1982). Since Belloff and Gold did not receive income from Chadwick after the transfer of their interests, any income it generated after that point may not be included in the gross income base upon which the penalty is calculated.

2. *Barrister Associates*

a. Computation of Penalty on an Annualized Basis

■ The Government assessed a total penalty of $534,693 against Barrister. $215,255 of this sum was allocated to the tax year 1982 and $319,437.50 to the tax year 1983. These allocations reflect the total income derived by Barrister from promotional activities it engaged in during the year of the assessment, even if the moneys themselves were not received during those periods. That is, all of the general partnership fees attributable to limited partnerships promoted in 1982 are included in the assessment for 1982, even though some of those fees may not have been received until

1983. The same method of allocation was used for income from partnerships promoted in 1983.

Barrister argues that this method of assessment is improper. Specifically, it contends that section 6671(a) dictates the method to be used in all penalty assessments under Subchapter B of Chapter 68 of the Code and requires that penalties "shall be assessed and collected in the same manner as taxes." I.R.C. § 6671(a) (1988). Since taxes are assessed and collected on an annualized basis, Barrister argues that the Government must also assess section 6700 penalties annually and may only assess them against a base consisting of the gross income actually received within the year of the assessment.

There is a split in authority on this issue, with the Ninth Circuit adhering to the view expressed by Barrister. *See Bond v. United States*, 872 F.2d 898, 901 (9th Cir.1989). The bulk of the courts which have considered this question, however, have adopted the position that section 6700 penalties are to be computed on a transactional rather than an annual basis and this Court finds their reasoning persuasive. See *Sage v. United States*, 908 F.2d 18, 22–23 (5th Cir.1990); *Planned Investments, Inc. v. United States*, 881 F.2d 340, 344 (6th Cir. 1989); *Gates v. United States*, 874 F.2d 584, 588 (8th Cir.1989).

Unlike other tax penalty statutes, section 6700 penalizes conduct unrelated to the payment or nonpayment of a particular tax in a particular year. While it may be appropriate to require that the penalty for negligent underpayment of taxes be assessed upon an annualized basis because the violation upon which the penalty is premised occurs on that basis, there is simply no reason to impose such an artificial limitation on the assessment of section 6700 penalties. Indeed, as the *Sage* opinion aptly observes, section 6700 penalizes abusive transactions. As such, its penalties are tied to no particular time period and thus should be assessed on a transactional basis. *Sage*, 908 F.2d at 22.

The text of section 6700 supports the use of this method of assessment. Section 6700(a) requires violators to pay a penalty of 10% (now 20%) on the gross income "derived or to be derived" from the prohibited promotion. See I.R.C. § 6700 (1982). In demanding that the penalty be assessed only against the gross income derived in the year specified in the assessment, Barrister's approach essentially reads the "to be derived" language out of the statute. To be faithful to the language of the statute, assessment may not be limited only to gross income derived at the time of the assessment, but must also include any further gross income which the promoter "may reasonably expect to realize." See S.Rep. No. 494, 97th Cong., 2nd Sess. at 267, *reprinted in* 1982 U.S.Code Cong. & Admin.News 781, 1015.

### b. Limited Partnerships of Which Barrister Associates Was Not the General Partner

Barrister also disputes the inclusion of $125,000 of general partner fees in its gross income for the year 1983 on the grounds that a separate entity, Barrister Associates, Inc., and not Barrister was the general partner of limited partnerships # 122 and # 129. The government argues that the plaintiffs have not disproven that Barrister received these monies and that because it bears the burden of proof with respect to the amount of the penalty, it is not entitled to a reduction on this basis.

In support of their argument, the plaintiffs offer the testimony of Robert Gold. Gold, one of the plaintiffs in this action, testified that Barrister Associates, Inc. was a corporation formed by the plaintiffs on July 12, 1983 with a designated fiscal year ending October 31, 1983. (T.4227) The plaintiffs formed Barrister Associates, Inc., Gold stated, to allow corporations with similar fiscal years to invest in the tax shelters.

In opposition, the Government offers certain documentary evidence which to some extent corroborates Gold's testimony, but also tends to contradict it. The Form 1065 partnership tax returns filed by each of the limited partnerships for the fiscal year ending October 31, 1983 are signed "Barrister Associates, General Partner by: Robert

Belloff, GP." [8] The Schedules K–1 attached to these returns, indicate that Barrister Associates, Inc. was the general partner of both limited partnerships. These same schedules, however, also indicate that Barrister Associates, Inc. was a partnership rather than a corporation as Gold testified. The Forms 1065 filed by each limited partnership for the fiscal year ending October 31, 1984 are signed "Barrister Associates, Inc. by: Robert Gold." The K–1's attached to these returns indicate that "Barrister Associates," a partnership, was the general partner of each limited partnership. [9]

Additionally, the lease agreements giving each limited partnership the right to the use of certain of the book properties are signed by "Paul Belloff, General Partner of Barrister Associates, the General Partner." Similarly, the service agreements securing the services of the Lit/Serv. Corp. to perform the printing and binding of the books produced, are signed by "Paul Belloff, General Partner of Barrister Associates, the General Partner."

In the estimation of this Court, the weight of the documentary evidence suggests that Barrister, rather than Barrister Associates, Inc. was the general partner of limited partnerships # 122 and # 129. Moreover, it deems this evidence more persuasive on this question than the testimony of plaintiff Gold. Barrister has not met its burden of proof on this issue. The penalty assessed against it may not be reduced on this basis.

### c. Fees Owing to Barrister But Never Collected

■ Barrister also claims that it never received certain fees which were owed to it by limited partnerships # 109, # 113 and # 125 and that these fees should therefore be excluded from the base upon which the penalty is calculated. Because it never received these amounts, Barrister argues

that it may not be held to have "derived" them within the meaning of section 6700. Section 6700, however, dictates that the penalty be computed on the basis of "gross income derived *or to be derived.*" I.R.C. § 6700 (1982) (emphasis added). The legislative history of the section makes it clear that the "to be derived" language includes any income which the plaintiff could reasonably have expected to receive at the time of the assessment. See S.Rep. No. 494, 97th Cong., 2nd Sess. at 267, *reprinted in* 1982 U.S.Code Cong. & Admin.News 781, 1015. Since, at the time of the assessments, Barrister had a cause of action against the defaulting partner, it could reasonably have expected to derive that gross income. Its failure to do so is not now a basis for reducing the penalty assessed against it.

### 3. *Plaintiff Chadwick*
#### a. Cost of Sales

■ The government has assessed a $1,446,712.50 penalty against Chadwick, representing 10% of the $14,467,125 it received in sales commissions from the limited partnerships. Chadwick now claims that because it actually paid 95% of these commissions out as commissions to other sales representatives which it hired, it is entitled to a comparable reduction in the basis upon which the penalty is calculated. Specifically, it argues that the commissions it paid out to sales representatives represent the cost of sales and therefore should be excluded from the enterprise's gross income.

It is axiomatic that gross income includes "all income from whatever source derived," unless such income is specifically excluded by a section of the Code or Regulations. See I.R.C. § 61 (1988). Chadwick, however, cites no such authority in the Code or anywhere else to support its position that it is entitle to such an exclusion nor has this Court discovered any. Had it been a manu-

---

**8.** This Court interprets the abbreviation "GP" to mean general partner.

**9.** The K–1 attached to the fiscal 1983 return of limited partnership # 122 indicates that "Barrister Associates" is the general partner of the limited partnership. The name "Barrister Asso-

ciates" is typed in the space provided. Also in the space, following the name "Barrister Associates," appears the handwritten abbreviation "Inc." This handwritten abbreviation, however, has a line drawn through it.

facturing, mining or merchandising concern, plaintiff might have attempted to call the commissions cost of goods sold and thus exclude them from gross income. See Treas.Reg. § 1.61–3(a) (1990). Of course, Chadwick is a service business and so may not enjoy the benefits of this exception. Moreover, even if it could fit within section 1.61–3(a), that section specifically excludes the cost of sales from the calculation of cost of goods sold. Thus, the penalty assessed against Chadwick may not be reduced on this basis. *Id.*

b. Computation of the Penalty on an Annualized Basis

Like Barrister, Chadwick also contends that section 6700 penalties must be assessed on an annual rather than a transactional basis and, based upon this position, seeks to exclude certain portions of the gross income it derived from the penalty computations. For the same reasons set forth in connection with Barrister, this claim must be denied.

4. *Plaintiffs Universal and Townsend*

a. Purchase Price of Leased Properties as Cost of Goods Sold

■ The IRS has assessed penalties against Universal of $8,994,367 and against Townsend of $4,395,925; representing 10% of the total rental payments each received from the limited partnerships to which it leased the book properties. These amounts are significantly higher than those originally assessed in 1986. Plaintiffs claim that the increase resulted from a change in the theory upon which the IRS computed their gross income. As they tell it, in the Government's initial calculations, it subtracted the cash down payments they had made on the book properties from the total lease receipts to determine the gross income each derived. It allowed such a reduction, plaintiffs contend, because it viewed these payments as the cost of goods sold. When it reassessed the penalties, the Government reconsidered its view of what constituted plaintiffs' gross income and included the downpayments in the base upon which it calculated the penalties. Plaintiffs now argue strenuously that the IRS had it

right the first time around and that their gross income should be reduced to the originally computed figure.

Unfortunately for plaintiffs, it is clear that the government got it wrong the first time around and that its present calculations are accurate. The Code explicitly treats rent receipts as a component of gross income. *See* I.R.C. § 61 (1990). Nowhere, moreover, does the Code or the Regulations create an exclusion from gross income for the amount of such receipts equivalent to the purchase price of the item leased. *See id.;* Treas.Reg. § 1.61–8 (1990). The Regulations do allow an exclusion from gross income for the cost of goods sold. *See* Treas.Reg. § 1.61–3(a) (1990). That they do, however, can be of no benefit to the plaintiffs because the agreements they entered into do not call for the sale of the book properties, but rather provide for the leasing of those properties. Furthermore, as set out in section 1.61–3(a) of the regulations, the cost of goods sold exclusion is an extremely narrow one, specifically limited to only those businesses engaged in "manufacturing, merchandising or mining." Treas.Reg. § 1.61–3(a) (1990). Plaintiffs, as lessors, do not fit within any of these categories and so may not claim the benefit of the exclusion.

Plaintiffs attempt to meet these obvious obstacles in two ways. First, they contend that there is no rational basis for distinguishing between the tax treatment of a sale of property and the tax treatment of leases of property. Specifically, they argue that, if that portion of an item's sale price equivalent to the seller's own investment is a return of capital, then so also is that portion of the rents they have received a return of the capital they invested in the leased properties.

■ This position must be rejected. Restriction of the return of capital doctrine to sales of goods derives from the distinction between "capital" and "income." The Sixteenth Amendment gives Congress the power "to lay and collect taxes on incomes, from whatever source derived...." U.S. Const. amend. XVI. "Income," as the term

is used in the Amendment has been defined to include "the gain derived from capital, from labor, or from both combined." *Eisner v. Macomber*, 252 U.S. 189, 207, 40 S.Ct. 189, 193, 64 L.Ed. 521 (1920).[10] Similarly, it has been defined to exclude returns of capital such as those received when capital assets are sold. *See Id.; Doyle v. Mitchell Bros. Co.*, 247 U.S. 179, 185, 38 S.Ct. 467, 469, 62 L.Ed. 1054 (1918); *Stratton's Independence, Ltd. v. Howbert*, 231 U.S. 399, 415, 34 S.Ct. 136, 140, 58 L.Ed. 285 (1913). Capital is generally understood to mean "money or property used for the production of wealth." Ballentine's Law Dictionary (3d Ed.1969).

By definition, in any lease, the lessor retains title to the asset in question, but sells to the lessee the right to the use of that asset for a defined period. The leased asset thus falls squarely within the definition of capital. It is property used for the production of wealth. The rental payments, moreover, clearly fall within *Eisner*'s definition of income as "gain derived from capital." In no sense can these portions be considered a return of the lessor's capital. His capital remains in the form of the asset leased. There can be no return of capital until, as in the case of the manufacturer or merchandiser, that asset is sold or exchanged by the lessor.[11] While the distinction between income and capital is somewhat slippery, neither it, nor the treatment of rental payments as income which is premised upon it can be said to be irrational.

Second, plaintiffs argue that these leases "took on the characteristics of a sale in their hands" and therefore their direct costs may properly be labelled as cost of goods sold. To support this conclusion, they point out that the book properties were overvalued from the outset and were fully depreciated for tax purposes before the end of the lease term. Because the leases thus could provide them with no further tax benefits, they contend that the leases lost their character as leases and took on the characteristics of a sale. Plaintiffs offer no authority or reasoning to support this position.

Whatever its merits, this Court need not address plaintiffs' curious contention. Were it the Government which were seeking to recharacterize this transaction as a sale rather than a lease, this Court would be required to look to the substance of the transaction rather than the form given to it by the parties in order to determine the treatment it should receive under the Code. *Commissioner v. Court Holding Co.*, 324 U.S. 331, 334, 65 S.Ct. 707, 708, 89 L.Ed. 981 (1945). It is not the government, however, but rather the plaintiffs who negotiated these leases, who seek to avoid the form of this transaction. In such cases, there is a large and expanding body of authority which holds that a party may only challenge the form of its own transaction where it establishes circumstances which would constitute a defense to enforcement of the contract by the other party, such as fraud, mistake, duress or undue influence. *Schatten v. United States*, 746 F.2d 319, 322 (6th Cir.1984); *Bradley v. United States*, 730 F.2d 718, 720 (11th Cir.), *cert. denied*, 469 U.S. 882, 105 S.Ct. 250, 83 L.Ed.2d 187 (1984); *Spector v. Commissioner*, 641 F.2d 376, 386 (5th Cir unit A), *cert. denied*, 454 U.S. 868, 102 S.Ct. 334, 70 L.Ed.2d 171 (1981); *Sullivan v. United States*, 618 F.2d 1001, 1007 (3rd Cir.1980); *Commissioner v. Danielson*, 378 F.2d 771, 775 (3rd Cir.), *cert. denied*, 389 U.S. 858, 88 S.Ct. 94, 19 L.Ed.2d 123 (1967); *but see Comdisco, Inc. v. Unit-*

---

**10.** This definition has since been expanded by the holding of *Commissioner v. Glenshaw Glass Co.*, 348 U.S. 426, 431, 75 S.Ct. 473, 477, 99 L.Ed. 483 (1955). *Glenshaw Glass*, however, explicitly sanctioned the use of the *Eisner* definition for the purpose of distinguishing "capital" from "gain" or the "return *on* capital." *Id.* at 430–31 & 430 n. 6, 75 S.Ct. at 476–77 & 476 n. 6 (emphasis added).

**11.** The liberal approach to capitalization of costs embodied in section 263A and emphasized by the plaintiffs does not affect this conclusion. While that section clearly expands the range of inventory costs which must be capitalized by the manufacturer or merchandiser, nowhere does it suggest that this capital investment may be returned to him prior to the sale of his goods. *See* I.R.C. § 263A (1990).

ed States, 756 F.2d 569, 578–79 (7th Cir. 1985); *Lucas v. Commissioner,* 58 T.C. 1022, 1032 (1972). Some courts have outlined a further exception to the so-called *Danielson* rule, looking to the substance of the transaction where strict adherence to its stated form would produce unjust results. *Spector, supra,* 641 F.2d at 392. While it has yet to address the *Danielson* line of cases directly, this Circuit has allowed taxpayers to challenge the forms of their own transactions in two situations. *Ullman v. Commissioner,* 264 F.2d 305, 308 (2d Cir.1959) (requiring "strong proof" that contractual allocations of consideration to goodwill and covenant not to compete were inaccurate); *Frelbro Corp. v. Commissioner,* 315 F.2d 784, 786 (2d Cir. 1963) (personal holding company penal surtax). Where the form of the transaction was adopted primarily to avoid taxes, however, it has firmly refused to allow such challenges. *Hoffman Motors Corp. v. United States,* 473 F.2d 254, 257 (2d Cir. 1973); *Frelbro, supra,* 315 F.2d at 786.

On these facts, it is entirely appropriate to bind plaintiffs to the form of transaction which they originally adopted. Plaintiffs here, in conjunction with the other plaintiffs, sought to offer tax shelters to the investing public. They chose to structure these transactions as leases primarily to offer the greatest possible package of tax benefits to potential limited partners. By using the lease form, plaintiffs were able to pass through the investment tax credit on the book properties and allow the limited partners to deduct the equipment rentals as business expenses. Moreover, the leases themselves reflect this orientation. Each bound the lessor to "take no action with respect to this lease or otherwise, which would adversely effect the benefits of the investment tax credit assigned to the lessee and its partners pursuant hereto." *See, e.g.,* Deft's Ex. 40. While this case differs somewhat from the prior holdings of this Circuit in that the taxpayer here did not structure the transaction to enhance his own tax benefits but those of others, it is clear that plaintiffs sought to profit financially from the tax avoidance of the limited partners. It is the opinion of this Court that the logic of *Hoffman* and *Frelbro* applies to tax shelter promoters as well as to entities which seek to avoid taxes on their own behalf.

Moreover, many of the policies underlying the *Danielson* rule support its application in a case such as this one. As is aptly pointed out by the cases adopting that rule, to allow plaintiffs such as these to challenge the form of their own transactions, encourages others to misrepresent the nature of their transactions intentionally. In a system premised upon voluntary compliance, such a policy could be enormously damaging. Even in cases where there is no intention to misrepresent the nature of the transaction, a less stringent rule encourages parties to resort to litigation unjustifiably, simply because they have not failed to project the tax consequences of their transactions. Additionally, there is little unfairness in binding the plaintiff here, although the government would not be bound if it challenged the form of this transaction. Whereas the Government must take transactions as it finds them, the parties are free to structure them as they choose and may not be bound to terms to which they have not previously agreed.

Thus, given the holdings of this Circuit and the many cases which have adopted it in other circuits, this Court will apply the *Danielson* rule in this case. Plaintiffs may not challenge the form which they have themselves given this transaction unless they can establish that they were induced to enter this contract by fraud, mistake duress or undue influence or that binding them to its terms would otherwise be unjust. They have introduced no evidence which suggests that any of these conditions are present here. For that reason, they may not argue that these leases are in substance sales and may not reduce the gross income derived from the leases by deducting their downpayments on the book properties as cost of goods sold.

### b. Sales Commissions as Cost of Goods Sold

 Like Chadwick, Universal and Townsend seek to label sales commissions and appraisal expenses "cost of goods

sold" and thus exclude them from gross income. They seek to do this by arguing that these costs should be capitalized as an inventory cost under section 263A. See I.R.C. § 263A (1988). As noted above, however, the cost of goods sold exclusion does not allow capitalization of selling expenses. Additionally, since the plaintiffs leased rather than sold the book properties, even if such costs were permitted to be capitalized, they could not be excluded from gross income as a cost of goods sold for the same reasons sketched above.

### c. Assessment of the Penalties on an Annualized Basis

For the reasons set forth in connection with Barrister, no reduction in the assessed penalties can be granted on these grounds.

### d. Statute of Limitations

 Neither section 6700 or section 6703 contain a statute of limitations. Because of this omission, the parties now dispute whether and, if so what, statute of limitations should apply to penalty actions under section 6700.

Universal and Townsend urge this Court to adopt the three year statute of limitation contained in section 6501(a) of the Code. On this basis, they seek dismissal of the IRS' 1989 additional assessments as time-barred because they were made more than three years after the conclusion of the conduct penalized.[12] The plaintiffs again premise their argument on section 6671(a)'s requirement that penalties are to be assessed and collected in the same manner as taxes. I.R.C. § 6671(a) (1988). Given this directive, they argue, this Court must apply the three year limitations period generally applicable to the assessment of taxes. *Id.* § 6501(a).

In response, the government argues that no statute of limitations is applicable to section 6700. With considerable reluctance, this Court must agree. By its terms, section 6501(a)'s statute of limitations is triggered by the filing of a return. Id. ("Except as otherwise provided in this

section, the amount of any tax imposed by this title shall be assessed within 3 years after the return was filed....") Since section 6700 penalizes conduct alone, and does not depend upon the filing of a return, clearly the statute of limitations contained in section 6501(a) is inappropriate. *Sage v. United States*, 908 F.2d 18, 23–24 (5th Cir. 1990); *Agbanc, Ltd. v. United States*, 707 F.Supp. 423, 426–27 (D.Ariz.1988); *Emanuel v. United States*, 705 F.Supp. 434, 435–36 (N.D.Ill.1989); *Kuchan v. United States*, 679 F.Supp. 764, 767–68 (N.D.Ill. 1989).

 Moreover, the government enjoys special protection from statutes of limitations. It is not generally subject to such statutes unless Congress expressly provides otherwise. *United States v. Podell*, 572 F.2d 31, 35 n. 7 (2d Cir.1978); *United States v. Tri–No Enterprises*, 819 F.2d 154, 158 (7th Cir.1987); *United States v. City of Palm Beach Gardens*, 635 F.2d 337, 341 (5th Cir.), *cert. denied*, 454 U.S. 1081, 102 S.Ct. 635, 70 L.Ed.2d 615 (1981). Where no such statute applies, the government may bring its action at any time. *City of Palm Beach Gardens*, 635 F.2d at 341. Finally, even in cases where a governmental cause of action is subject to a time limitation, that limitation is strictly construed. *Badaracco v. Commissioner*, 464 U.S. 386, 392, 104 S.Ct. 756, 761, 78 L.Ed.2d 549 (1984).

Finally, it is not completely inappropriate that no statute of limitations apply to section 6700. It is, in essence, an anti-fraud provision and, in the Code's scheme of anti-fraud measures, such provisions frequently are not subject to any statute of limitations. *Sage*, 908 F.2d at 25; *Kuchan*, 679 F.Supp. at 768. See I.R.C. §§ 6501(c), 6694(b), 6696(d)(2) (1988).

The government's second set of assessments are therefore not barred by any statute of limitations.

---

**12.** Plaintiffs do not challenge the timeliness of the original assessments, which were made in 1986.

### 5. *Plaintiff Madison Library*

Plaintiff Madison Library does not challenge the penalty assessed against it. This Court therefore adopts the assessment of the IRS as the proper amount of the penalty for which it is liable.

### CONCLUSION

The penalties shall be computed in a manner consistent with this opinion. Within two weeks of the date upon which this Memorandum and order is entered upon the docket, the parties shall submit annotated numerical calculations reflecting the conclusions herein.

SO ORDERED.