**Bill GATES, Appellant,**

**v.**

**UNITED STATES of America, Appellee.**

**No. 88–1765.**

United States Court of Appeals, Eighth Circuit.

Submitted April 11, 1989.

Decided May 15, 1989.

Bill Gates, pro se.

Gary R. Allen, Washington, D.C., for U.S.

Before ARNOLD, FAGG, and WOLLMAN, Circuit Judges.

PER CURIAM.

Bill Gates appeals from the district court's order granting summary judgment against him in his suit contesting a $69,000 penalty assessed against him by the Internal Revenue Service (IRS) for promoting abusive tax shelters, 694 F.Supp. 610. On appeal Gates challenges the district court's determination of liability and its assessment of penalties. We affirm on the issue of liability and reverse as to the assessment of penalties.

In 1982 and 1983 Gates became involved with the promotion of two tax shelter schemes established by H & L Schwartz, Inc. (Schwartz, Inc.). Gates encouraged people to invest in American Educational Leasing (AEL) and American Videogame Leasing (AVL), by leasing recordings and

video programs for a stated price. AEL or AVL would then pass through to each investor/lessee an investment tax credit calculated at 10% of the program's stated purchase price, which Schwartz, Inc. stated was equivalent to the program's fair market value. Section 48(d) of the Internal Revenue Code of 1954 permitted a lessor to pass the investment tax credit through to a lessee, provided the lessee "acquired" the property for an amount equal to its fair market value.

Gates, as a representative for AEL and AVL, solicited tax preparers by presenting promotional material containing projections of the tax benefits to be derived by the investors. These presentations included slide/videotape shows detailing how the audio and video programs were manufactured and how they were to be reproduced and distributed, and referred to various appraisals to answer questions concerning the programs' purported fair market value. Gates received a percentage of the money on every lease completed by tax preparers he recruited. Eventually, Gates received fees on 132 leases, totaling $79,791.

In an earlier proceeding, a United States district court in California, after hearing testimony that the audio programs were essentially worthless and the video programs were overvalued by at least 2000%, found that Schwartz, Inc. and its chief operating officer had been promoting a fraudulent tax scheme in violation of 26 U.S.C. § 6700 [1] (amended 1984). Subsequently, the IRS established that Gates had participated in the sale of sixty-nine interests in the Schwartz, Inc. tax shelters, and under section 6700 assessed a penalty of $1000 per sale, for a total of $69,000.

Gates paid a portion of the penalty and filed an administrative claim for refund, which was denied by the IRS. He then filed this refund suit in the Eastern District Court of Arkansas claiming that (1) he had never assisted in the organization of the scheme, nor furnished a gross valuation overstatement; and, alternatively, (2) the penalty should have been assessed at 10% of the gross income derived from his alleged participation ($7971), instead of $1000 per sale ($69,000).

The district court granted the government's motion for summary judgment, finding that the evidence that Gates had solicited, trained, and equipped salesman for the AEL and AVL programs was sufficient to establish that he "assisted in the organization" within the meaning of section 6700(a)(1)(A)(ii), and that his admission that he had furnished the offering materials containing the valuation overstatements was sufficient to establish he "furnished" such statements within the meaning of section 6700(a)(2)(B). Because the section imposed strict liability, the court concluded that Gates' alleged ignorance of the overvaluation was no defense. Finally, the court granted summary judgment on the issue of the proper calculation of the penalty, finding that "the plain language of the statute and the weight of authority favors the government's position."

## A. Liability

Gates acknowledged he recruited tax preparers to market AEL and AVL business opportunities to their clients, recruited sales people to solicit tax preparers and to sell interests in AEL and AVL,

1. Section 6700 provides as follows: **Promoting abusive tax shelters, etc.**

   (a) **Imposition of penalty.**—Any person who—
   (1) (A) organizes (or assists in the organization of)—
   (i) a partnership or other entity,
   (ii) any investment plan or arrangement, or
   (iii) any other plan or arrangement, or
   (B) participates in the sale of any interest in an entity or plan or arrangement referred to in sub-paragraph (A), and
   (2) makes or furnishes (in connection with such organization or sale)—

   (A) a statement with respect to the allowability of any deduction or credit, the excludability of any income, or the securing of any other tax benefit by reason of holding an interest in the entity or participating in the plan or arrangement which the person knows or has reason to know is false or fraudulent as to any material matter, or
   (B) a gross valuation overstatement as to any material matter,
   shall pay a penalty equal to the greater of $1,000 or 10 percent of the gross income derived or to be derived by such person from such activity.

"strongly pointed out" to those he recruited that they were not to give tax advice, and "made clear" they were to enlist tax preparers in the same way he did. He also admitted that in responding to questions about the valuation, he would refer individuals to the valuation statements contained in the promotional offering materials. This conduct is sufficient to satisfy the requirements of section 6700.

Gates also seeks to avoid liability on the ground that he did not know that the valuations were gross overstatements. When read in its entirety, however, section 6700(a)(2) indicates that the government can establish liability by showing that a person made or furnished either a tax-related statement he knew or had reason to know was false *or* a gross valuation overstatement. Accordingly, knowledge is relevant only when a promoter furnishes a false tax-related statement.

## B. Penalty Calculation

■ Under section 6700, the penalty for organizing or promoting abusive tax shelters is assessed as "the greater of $1,000 or 10 percent [now 20 percent] of the gross income derived or to be derived by such person *from such activity*." 26 U.S.C. § 6700(a) (emphasis added).

Gates argues that section 6700 mandates a minimum penalty equal to the greater of $1000 per year or 10% (now 20%) of the total amount of income earned from the sale of such shelters in any one year and that the assessment should be on an annual tax-year basis.

The IRS argues that the statute's use of singular terms—organization, sale, penalty, activity—clearly indicates congressional intent to impose a separate penalty of $1000, or 10% of the income derived from each organization of an abusive tax shelter or each sale of an interest therein. Accordingly, it argues that the penalty should be calculated on a transactional basis, *i.e.*, a minimum $1000 penalty for each prohibited sale. It also argues that the penalty

should be assessed once for the overall activity.

### 1. Standard of Review

We are mindful that an interpretation given a statute by the administering agency is entitled to considerable deference. *Groseclose v. Bowen*, 809 F.2d 502, 505 (8th Cir.1987). This deference, however, "is constrained by our obligation to honor the clear meaning of the statute, as revealed by its language, purpose, and history." *International Bhd. of Teamsters v. Daniel*, 439 U.S. 551, 566 n. 20, 99 S.Ct. 790, 800 n. 20, 58 L.Ed.2d 808 (1979). We also recognize that although the section 6700 penalty is an important weapon in the IRS's efforts to eliminate abusive shelters, the penalty must be assessed fairly. Furthermore, principles of statutory interpretation require resolution of ambiguities in penalty statutes in favor of lenity. *See United States v. Anderson*, 626 F.2d 1358, 1370 (8th Cir.1980), *cert. denied*, 450 U.S. 912, 101 S.Ct. 1351, 67 L.Ed.2d 336 (1981). Accordingly, we conclude that a transactional "per sale" assessment is not supported by a reasoned analysis of the statute or legislative history and that such an interpretation would lead to inequitable results. We agree with the IRS, however, that the assessment should be made on a one-time basis rather than annually.

### 2. Calculation of Penalty on Non–Transactional Basis

Lower court decisions that have addressed the meaning of "such activity" in the context of section 6700 penalties have reached different results. Of the reported decisions, we find the analysis in *Spriggs v. United States*, 660 F.Supp. 789, 791 (E.D. Va.1987), *aff'd without published opinion*, 850 F.2d 690 (4th Cir.1988), and *In re Bowen*, 84 B.R. 214 (Bankr.D.Utah 1988), to be most persuasive.[2] As noted in *Spriggs*, the term "activity" stands in contrast to the use of "organization or sale" in the previous subsection. Had Congress intended

---

2. *But see Popkin v. United States*, 699 F.Supp. 893, 88–2 U.S. Tax Cas. (CCH) ¶ 9461 (N.D.Ga. 1988) (penalty assessed per transaction); *John-*

son v. United States, 677 F.Supp. 529, 531 (E.D. Mich.1988) (same); *Waltman v. United States*, 618 F.Supp. 718, 720 (M.D.Fla.1985) (same).

the penalty to apply to each separate sale, it could have repeated the phrase "such organization or sale" or used explicit language to that effect, as it did in other penalty provisions.[3]

Gates' reading of the statute is further bolstered by the legislative history. In 1982 Congress enacted section 6700 to attack the source of abusive tax shelters by penalizing the "promoters." *See* S.Rep. No. 494, 97th Cong., 2d Sess. 1, *reprinted in* 1982 U.S.Code Cong. & Admin. News 781, 1014. In 1984 Congress concluded that the existing section 6700 did not effectively deter abusive tax shelter promoters, and it raised the penalty from 10% to 20% of income derived from the activity. The House Committee Report on the 1984 Act states:

> The bill increases the penalty for promoting abusive tax shelters to the greater of 20 percent of the gross income derived, or to be derived, from the activity, or $1,000. The committee did not increase the $1,000 penalty because, as originally enacted, the $1,000 was intended to be a minimum penalty on small promoters who derive little income from the deals they promote.

H.R.Rep. No. 432, 98th Cong., 2d Sess., 1357–58, *reprinted in* 1984 U.S.Code Cong. & Admin. News 697, 1009.

This comment indicates that the $1000 amount was not to be compounded as a means of punishing high-volume tax shelter promoters, but rather established a minimum penalty to be applied when 20% of the gross income from the activity of promoting abusive tax shelters fell below $1000. Although the government argues that the opinion of a Congress subsequent to the Congress that enacted section 6700 deserves little weight, views of a subsequent Congress are entitled to significant weight when the precise intent of the enacting Congress is obscure. *See Seatrain Shipbuilding Corp. v. Shell Oil Co.*, 444

U.S. 572, 596, 100 S.Ct. 800, 813–14, 63 L.Ed.2d 36 (1980).

The IRS also argues that Congress intended the penalty to be a means of reimbursing the IRS for the cost of auditing individual returns of persons involved in tax shelter schemes, thereby making it entirely appropriate to impose a penalty based on each sale. We disagree. A close reading of the legislative history reveals that Congress was concerned with the IRS's limited resources and determined that they could be used more economically by focusing on the prevention of tax shelters instead of .enforcement actions. "[T]he Internal Revenue Service can be expected to approach the problem with vigor since prevention * * * will require less manpower than enforcement action against numerous investor-taxpayers." H.R.Rep. No. 494, 97th Cong. 2d Sess. 1, *reprinted in* 1982 U.S.Code Cong. & Admin. News 781, 1014.

In addition, as noted in *In re Bowen*, 84 B.R. at 218, the scope of section 6700 covers both organizers and sellers. Under the IRS's reading, organizers who retain several individual sellers would likely be subjected to a 10% penalty for the creation of the overall shelter, whereas the sellers would likely be penalized $1000 per sale. We find no legislative support for punishing sellers more severely than organizers, and we conclude that such an inconsistent application would not aid in achieving the goal of discouraging abusive tax shelters.

Moreover, as noted in *Spriggs*, 660 F.Supp. at 792, the IRS's reading could result in inequitable penalty assessments between two promoters: one who earns a 10% commission on the sale of one shelter for $10,000; the other who earns a 10% commission on the sale of ten shelters for $1000 each. Although each seller earned $1000 in commission, the first would be penalized $1000, the second $10,000. Although the IRS argues that a larger penalty is justified in the second instance be-

---

**3.** Individuals who aid and abet in the understatement of tax liability must pay a penalty "with respect to each such document" (26 U.S.C. § 6701(a) (1982)). Similarly, a penalty for failure to supply a taxpayer identification number

(26 U.S.C. § 6676(e)), or to supply information on a place of residence (26 U.S.C. § 6687), or a tax shelter identification number (26 U.S.C. § 6707(b) (Supp. IV 1986)) applies to "each such failure."

588

cause of the increased administrative work generated by multiple proscribed sales, we have already concluded that Congress did not intend the penalty provision to be a means of reimbursing the IRS for the cost of auditing returns.

Finally, the IRS argues that Gates' reading of the statute would result in his paying a penalty of approximately $7900 on three years' gross income totaling approximately $79,000, a penalty that hardly furthers the legislative goal of deterring the organization of abusive tax shelters. Nevertheless, Congress chose a percentage penalty instead of opting for a complete forfeiture of all income derived from abusive tax shelter schemes, and we are bound by that choice.

### 3. Assessment Period

The assessment of section 6700 penalties is governed by 26 U.S.C. § 6671 which reads in relevant part:

(a) **Penalty assessed as tax.—**
The penalties and liabilities provided by this subchapter shall be paid upon notice and demand by the Secretary, and shall be assessed and collected in the same manner as taxes. Except as otherwise provided, any reference in this title to 'tax' imposed by this title shall be deemed also to refer to the penalties and liabilities provided by this subchapter.

The IRS argues that the penalty should be assessed once. Gates argues the penalty should be assessed annually, and urges us to adopt the analysis of the *Spriggs* court which focused on the language directing that penalties "be assessed * * * in the same manner as taxes," and concluded that an annual basis determination was proper because taxes are assessed on an annual basis. *Spriggs*, 660 F.Supp. at 791 n. 2.

We do not find this conclusory statement persuasive. Indeed, it does not appear that section 6671 dictates any particular assessment period for section 6700 penalties, which do not relate to any specific tax. Accordingly, we find the IRS's assessment based on all tax-shelter income, actually received or reasonably expected to be re-

ceived at the time of the assessment, to be reasonable, as it makes computation of the penalty administratively easier.

Accordingly, we affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.