**In re MDL–731—TAX REFUND LITIGATION OF ORGANIZERS AND PROMOTERS OF INVESTMENT PLANS INVOLVING BOOK PROPERTIES LEASING.**

**BARRISTER ASSOCIATES, Paul Belloff, Parliament Securities Corp., Robert Gold, Madison Library, Inc., Universal Publishing Resources, Ltd. and Geoffrey Townsend, Ltd., Plaintiffs–Appellants–Cross–Appellees,**

v.

**UNITED STATES of America, Defendant–Appellee–Cross–Appellant.**

**Nos. 1376, 1405 and 1406, Dockets 91–6289, 91–6291 and 91–6317.**

United States Court of Appeals, Second Circuit.

Argued April 9, 1992.

Decided March 22, 1993.

---

David M. Kohane, New York City (Jules Ritholz, Atea Marin, Kostelanetz Ritholz Tigue & Fink, of counsel), for plaintiffs-appellants-cross-appellees Madison Library, Inc., Universal Pub. Resources, Ltd. and Geoffrey Townsend, Ltd.

Nathan M. Silverstein, New Haven, CT (Kurt F. Zimmermann, Silverstein & Osach, P.C., of counsel), for plaintiffs-appellants-cross-appellees Barrister Associates, Paul Belloff, Parliament Securities Corp., and Robert Gold.

Steven W. Parks, Atty., Tax Div., Dept. of Justice, Washington, DC (James A. Bruton, Acting Asst. Atty. Gen., Gary R. Allen, Jonathan S. Cohen, Attys., Tax Div., Dept. of Justice, Washington, DC, Andrew J. Maloney, U.S. Atty., E.D.N.Y., Brooklyn, NY, of counsel), for defendant-appellee-cross-appellant.

Before: FEINBERG, WINTER and ALTIMARI, Circuit Judges.

WINTER, Circuit Judge:

This is an action for a refund of penalties paid to the Internal Revenue Service ("IRS") pursuant to Internal Revenue Code ("I.R.C.") § 6700 (1982). In 1986, the IRS assessed penalties against each of the appellants for promoting and organizing allegedly abusive tax shelters. After paying fifteen percent of the assessments, appellants filed suit for a refund, pursuant to I.R.C. § 6703 (1982). The government counterclaimed for payment of the remaining eighty-five percent of the penalties assessed.

On July 11, 1990, following a jury trial before Chief Judge Platt, each of the seven appellants was found to have promoted or organized an abusive tax shelter and was therefore liable to pay the penalty imposed by I.R.C. § 6700. By memorandum and order, later amended, the district court determined the amount of the penalty owed by each appellant. *In re Tax Refund Litigation*, 766 F.Supp. 1248 (E.D.N.Y.1991). On appeal, appellants attack both the jury's finding of liability and the district court's calculation of penalties. The government cross appeals, arguing that the district court failed to include certain income purportedly earned by two of the appellants—Robert Gold and Paul Belloff. We affirm on the appeal and affirm in part and reverse in part on the cross-appeal.

## BACKGROUND

### 1. *The Parties*

Central to the tax shelters at issue were three individuals—appellants Robert Gold and Paul Belloff, and Irving Cohen, who is not a party to the instant action. Gold, Belloff, and Cohen, or some combination of the three, were the shareholders, corporate officers, or general partners of each of the organizations responsible for promoting and organizing the tax shelters.

Irving Cohen founded and served as the president and director of appellant Madison Library, Inc. ("Madison"), a Nevada corporation with its principal place of business in Las Vegas. All of Madison's stock is directly or indirectly owned by, or held in trust for, Cohen's children. Madison, in turn, is the corporate parent of appellants Geoffrey Townsend, Ltd. ("Townsend") and Universal Publishing Resources, Ltd.

("Universal"), also Nevada corporations with their principal place of business in Las Vegas. Cohen is the chief executive officer and president of Townsend and Universal, whose stock is also held in trust for Cohen's children.

Appellant Barrister Associates is a New York general partnership established in 1981 by Belloff and Gold, who serve as general partners. It was formed to organize and act as general partner of, *inter alia*, the ninety-five limited partnerships relevant to the instant matter—Barrister Equipment Associates Series 81 through 167, 171 through 175, 201, 301, and 302.

Appellant Parliament Securities Corp., formally known as Chadwick Investment Co. ("Chadwick"), is a New York subchapter S corporation. At most pertinent times, Gold, Belloff, and Ronald Cohen (not related to Irving Cohen) each owned one-third of Chadwick's outstanding stock. Chadwick was responsible for marketing the Barrister Equipment Associates limited partnerships to investors.

## 2. *The Transactions and Their Tax Consequences*

The tax shelters promoted by appellants involved the 1982 and 1983 purchase and subsequent leasing of certain properties, *i.e.*, metallic plates, lithographic films, and other equipment used in the printing of soft and hard cover books, and unencrypted master computer discs used in the manufacturing of computer software (the "Properties"). Townsend and Universal, through their president and CEO Irving Cohen, negotiated with a number of different publishers to purchase the Properties.

The transfer of each of the Properties was effectuated by an acquisition agreement, executed by the purchaser (Townsend or Universal) and the publisher. The terms of each purchase were essentially identical—Townsend or Universal made a small downpayment, usually representing two to three percent of the purchase price, and executed a recourse promissory obligation for the remainder. (This obligation was referred to throughout the trial as a promissory note, although no note separate from the acquisition agreement existed. We will also use the term "promissory note" to identify Townsend's and Universal's obligation.) A chattel mortgage on the Properties secured each of the promissory notes. These notes matured approximately twelve years after execution and bore interest at a rate of nine percent per annum. No payments (interest or principal) were due during the intervening twelve years except to the extent the works produced from the transferred Properties realized net revenues. After twelve years, Townsend and Universal were obligated to make balloon payments of all remaining unpaid interest and principal.

The purchase price of the Properties was arrived at in negotiations between a representative of the particular publisher and Irving Cohen. The actual method of determining the price varied, depending upon which publisher was selling the Property. Generally, however, the purchase price was a percentage of the income stream from an agreed-upon number of printings of a book or piece of software. That is, the price was derived by multiplying the quantity of books or software produced in each of five or seven printings (or some other number, depending on the seller) by a set payment per copy (the amount of this payment was higher for the first printing than for subsequent printings). An exhibit attached to the acquisition agreement for each Property indicated the number of copies to be distributed in the initial printing. This number was agreed upon by the publishers and Cohen. For purposes of determining the purchase price, Cohen and the publishers appear to have assumed that the same number of copies would be produced in all subsequent printings.

The Properties were purchased for widely varying amounts—from a minimum of about $100,000 to well over $1,000,000. According to Gold's testimony, Townsend and Universal purchased 3,774 Properties during 1982 and 1983. Because they made only a small downpayment and executed a promissory agreement for the balance, Townsend and Universal took on large debt obligations pursuant to their 1982 and 1983

purchases. Townsend, the purchasing entity for 1982, owed $627,155,989 at the end of that year (excluding any interest). Universal, which was responsible for the 1983 purchases, had an outstanding debt of $1,313,061,699 (again excluding any interest). Putting aside any cash downpayments, the 3,774 Properties purchased by Townsend and Universal during 1982 and 1983 cost, on average, over $500,000 per Property.

Most of the books and software to be produced from the Properties had never before been published. None, at least, had ever before been published in the same form. All were ready for publication. The books and software covered a wide range of topics, and included such titles as *Drinking with Dickens, The World of the Older Woman, More Pac–Mania, World of Horses Coloring Album,* and *Berserker Raids.*

After purchasing the Properties, Townsend and Universal leased a bundle of diverse Properties representing about forty works (books or software) to each of the ninety-five Barrister Equipment Associates limited partnerships. (Townsend acted as lessor for the thirty-five limited partnerships established in 1982, Universal for the sixty established in 1983.) The terms of the leases were formalized in lease agreements, executed by Townsend or Universal and the relevant Barrister Equipment Associates limited partnership. The leases remained in effect for approximately eight years after the Properties were delivered and obligated the limited partnerships, as lessees, to make annual rent payments to either Townsend or Universal.

Under I.R.C. §§ 38 and 46(a)(2)(B), Townsend and Universal were allowed, disregarding other possibly relevant tax rules, a credit against their federal income taxes. This was ten percent of the value of the purchased Properties during 1982, and eight percent during 1983, even though only a small fraction of the purchase price had been paid. The lessors—Townsend or Universal—then made a pass-through election pursuant to I.R.C. § 48(d). The Section 48(d) election designated the limited partnerships as the beneficiaries of this credit as to all Properties each partnership leased.

A partnership, however, is generally not a taxable entity, *see* I.R.C. § 701, and this investment tax credit was enjoyed by the individual partners of the limited partnerships. Each partner acquired a proportionate share of the credit, based on his or her capital interest in the partnership, and each was allowed to take advantage of this share when filing his or her personal income tax return. Additionally, each of the partners took a tax deduction based on his or her proportionate share of the operational expenses of the partnership. In combination, this credit and deduction produced attractive tax consequences for wealthy investors. A brochure used to market one of the limited partnerships—Barrister Equipment Associates Series 115—indicated that, in return for a $50,000 investment, an investment tax credit of $50,600 ($43,100 in 1983 and $7,500 in 1984), as well as tax deductions of $15,000 for 1983 and $35,000 for 1984, would become available. Assuming an investor was in the fifty-percent income tax bracket, the brochure advised that the total tax savings in return for a $50,000 investment would be $50,600 in 1983 and $25,000 in 1984.

None of the limited partnerships engaged or risked capital in the actual printing, manufacturing, or distribution of any books or software. Instead, the limited partnerships retained entities known as service contractors to perform these tasks and to bear the concomitant costs. Service agreements for the Properties were executed by the limited partnerships and the service contractors. These agreements were negotiated by Irving Cohen, usually in connection with the acquisition of the Properties covered by a particular service agreement. In fact, the service contractor for a particular Property was generally affiliated with the publisher from whom that Property had been purchased. Partially as a result of this connection between the selling publisher and the service contractor, the limited partnerships never obtained physical control over any of the Properties.

The service agreements specified both an "anticipated initial printing" and a "minimum additional printing(s)" for every Property. A service contractor was obligated to print, bind, and distribute the number of copies called for in the initial printing. If requested by the limited partnership, the service contractor also had to make available additional copies up to the number specified by the minimum additional printing term of the agreement. Notably, the number of copies specified in the "minimum additional printing(s)" category, *i.e.,* the maximum number of copies the service contractor was obliged to print after the initial print order, bore no relationship to the number of copies from additional printings that Cohen and the publisher assumed would be printed when they negotiated the purchase price.

In return for this work, the service contractors collected fees from the limited partnerships—typically a portion of the sales price of each book or piece of software printed and distributed. However, the contractors received these fees only to the extent any books or software were actually sold. In addition, the contractors were reimbursed for printing, binding and distribution fees, but again only to the extent revenues actually were generated by the sale of books and software.

Chadwick acted as the placement agent for the limited partnerships and was thus responsible for finding sophisticated investors interested in participating in the tax shelter program. Chadwick received from the limited partnerships, in return for its efforts in selling partnership units, a sales commission of $5,000 per unit sold. Between thirty and forty partnership units were available in each of the ninety-five Barrister Equipment Associates limited partnerships, at a price of $50,000 per unit. This $50,000 payment was due in three installments over the course of two years— $5,000 at the closing, $20,000 sometime later in the year of the purchase, and $25,000 sometime during the year following the purchase. Barrister Associates, the general partner of the limited partnerships, invested $25,000 in each limited partnership

and received a general partner's fee of approximately $62,500 from each.

### 3. *Procedural History*

In 1986, the IRS determined that the transactions described above constituted the promotion of an abusive tax shelter, in violation of I.R.C. § 6700, and assessed the following penalties against each of the appellants:

| | |
|---|---|
| Barrister Associates | $5,306,000 |
| Paul Belloff | $5,306,000 |
| Chadwick (Parliament) | $5,211,000 |
| Robert Gold | $5,306,000 |
| Madison Library | $ 400,000 |
| Universal Publishing | $5,399,811 |
| Geoffrey Townsend | $2,739,013 |

At the same time, the IRS assessed a penalty of $3,687,000 against Irving Cohen. Cohen, as well as each of the appellants here, paid fifteen percent of the assessed penalties, thus staying further collection by the IRS. *See* I.R.C. § 6703(c). Soon thereafter, Gold, Belloff, Chadwick, and Barrister Associates together filed an action in the Eastern District of New York for a refund of their portion of the penalties paid to the IRS. *See Barrister Associates v. United States,* No. CV 87–0403 (E.D.N.Y. filed Feb. 13, 1987). Madison, Townsend, and Universal similarly filed for a refund; their actions were brought in the District of Nevada. *See Madison Library, Inc. v. United States,* No. CV–S–87–125 (D.Nev. filed Feb. 12, 1987); *Geoffrey Townsend, Ltd. v. United States,* No. CV–S–87–127 (D.Nev. filed Feb. 13, 1987); and *Universal Publishing Resources, Ltd. v. United States,* No. CV–S–87–126 (D.Nev. filed Feb. 12, 1987). Finally, Irving Cohen filed a suit for a refund in the Southern District of Florida. *See Cohen v. United States,* No. 87–0265–CIV (S.D.Fla. filed Feb. 13, 1987). In each of these suits, the government counterclaimed for the unpaid portions of the penalty. In August 1987, the Judicial Panel on Multidistrict Litigation transferred the three Nevada cases and the Florida suit to the Eastern District of New York for pretrial purposes.

Cohen, Barrister Associates, Parliament, Belloff, and Gold then moved for partial summary judgment, arguing that they

were at least entitled to a partial refund because the IRS had erred in its computation of the penalty in the original assessments against them. Chief Judge Platt agreed and ordered the IRS to reassess the penalties. *In re Tax Refund Litigation,* 698 F.Supp. 439 (E.D.N.Y.1988). In July 1989, the IRS, in compliance with this ruling, assessed the following penalties against each of the appellants:

| | |
|---|---|
| Barrister Associates | $ 534,693 |
| Paul Belloff | $ 124,672 |
| Chadwick (Parliament) | $1,446,713 |
| Robert Gold | $ 124,672 |
| Madison Library | $ 400,000 |
| Universal Publishing | $8,994,367 |
| Geoffrey Townsend | $4,395,925 |

The increase in the penalties against Universal and Townsend, who were not parties to the motion for partial summary judgment, resulted from a change in the method by which the government determined their gross income. *In re Tax Refund Litigation,* 766 F.Supp. at 1252.

In October 1989, the three Nevada actions, *Madison Library, Inc. v. United States, Geoffrey Townsend, Ltd. v. United States,* and *Universal Publishing Resources, Ltd. v. United States,* were, at the request of appellants, consolidated for trial in the Eastern District with the already-existing New York suit, *Barrister Associates v. United States.* Because of the government's opposition to consolidation, the Florida action, *Cohen v. United States,* was remanded to the Southern District of Florida for trial, although the remand and the trial were stayed pending the conclusion of the proceedings in the Eastern District. *In re Tax Refund Litigation,* 723 F.Supp. 922, 923 (E.D.N.Y.1989).

The consolidated cases were tried during the late spring and early summer of 1990. The jury's responsibility was limited to determining whether any of the appellants had promoted an abusive tax shelter, as defined by I.R.C. § 6700, and whether any were thus liable to pay a penalty. The government was the defendant in this refund action, but, because it bore the burden

of proof on liability, presented its main case first. In order to simplify matters, appellants agreed that six Barrister Equipment Associates limited partnerships (Series 115, 116, 117, 121, 123 and 126) would serve as representative of the scheme for purposes of the jury's verdict.

On July 11, 1990, the jury returned a special verdict, finding that appellants were liable for a Section 6700 penalty. Pursuant to an agreement between the parties, the district court then considered the amount of the penalty owed by each appellant. The court first held that the government's assessment was presumed to be valid, and that the appellants bore the burden of proving that the facts necessitated a reduction in that assessment. *In re Tax Refund Litigation,* 766 F.Supp. at 1253–55. Chief Judge Platt then ruled on each of the objections to the 1989 assessment and ordered the parties to submit detailed calculations of the penalties consistent with his rulings. *Id.* at 1255–65. On June 10, 1991, after receiving these calculations, the court entered judgment against the appellants for the following amounts:

| | |
|---|---|
| Barrister Associates | $ 534,692.50 |
| Paul Belloff | $ 9,667.00 |
| Chadwick (Parliament) | $1,446,712.50 |
| Robert Gold | $ 9,667.00 |
| Madison Library | $ 400,000.00 |
| Universal Publishing | $8,994,367.00 |
| Geoffrey Townsend | $4,395,925.00 |

Appellants' subsequent motions for judgment notwithstanding the verdict or for a new trial were denied without opinion in late September 1991. Appellants then brought this appeal from both the June 1991 judgment and the September 1991 denial of the post-judgment motions. The government cross-appealed from certain exclusions by Chief Judge Platt from the gross income base of the penalties assessed.

## DISCUSSION

■ Appellants attack both the jury's finding of liability [1] and the district court's

1. Appellants Barrister Associates, Chadwick, Belloff, Gold, Universal, and Townsend contend that the district court should have applied a

three-year statute of limitation to the assessment of the penalties. *See* I.R.C. § 6501(a) ("Except as otherwise provided in this section, the

calculation of the penalties. The government's cross appeal focuses solely on the penalty portion of the judgment. We turn first to appellants' challenges to the jury's verdict.

### 1. Appellants' Liability Under Section 6700

The version of Section 6700 of the Internal Revenue Code in effect at the time of the pertinent transactions imposed a penalty on:

Any person who—

(1)(A) organizes (or assists in the organization of)—

(i) a partnership or other entity,

(ii) any investment plan or arrangement, *or*

(iii) any other plan or arrangement, or

(B) participates in the sale of any interest in an entity or plan or arrangement referred to in subparagraph (A), and

(2) makes or furnishes (in connection with such organization or sale)—

(A) a statement with respect to the allowability of any deduction or credit, the excludability of any income, or the securing of any other tax benefit by reason of holding an interest in the entity or participating in the plan or arrangement which the person knows or has reason to known [sic] is false or fraudulent as to any material matter, or

(B) a gross valuation overstatement as to any material matter. . . .

I.R.C. § 6700(a).

■ The jury returned a special verdict, which found that appellants, in their organization and promotion of the representative Barrister Equipment Associates limited partnerships, had made: (i) gross valuation overstatements with regard to each of the Properties leased by the six representative limited partnerships and (ii) false or fraudulent statements with respect to tax benefits that might be available to those

who purchased an interest in one of the limited partnerships. Appellants contest both findings. Before turning to the specifics of their arguments, we note that because the Section 6700 penalty applies to either gross valuation overstatements or false or fraudulent statements, the penalty must be affirmed unless we reverse both jury findings. Because we affirm the finding regarding gross valuation overstatements, we do not reach the jury's finding regarding false or fraudulent statements.

■ A gross valuation overstatement is "any statement as to the value of any property or services if . . . the value so stated exceeds 200 percent of the amount determined to be the correct valuation." I.R.C. § 6700(b)(1). Whether such a gross valuation overstatement has been made is a question of fact, upon which the government bears the burden of proof. I.R.C. § 6703(a). The government introduced at trial the reports and testimony of four different appraisers, who together valued the Properties leased by the six representative limited partnerships as worth considerably less than one-half of their declared values.

■ The value of a piece of property must be established in order to determine whether an individual has made a gross valuation overstatement with respect to that property. *See* I.R.C. § 6700(b)(1). Generally, the correct or fair market value of a good is defined as the price at which a willing buyer would purchase the good from a willing seller. *See, e.g., United States v. Cartwright*, 411 U.S. 546, 551, 93 S.Ct. 1713, 1716–17, 36 L.Ed.2d 528 (1973); 5 Boris I. Bittker, *Federal Taxation of Income, Estates and Gifts* ¶ 132.1.2 (1984). A price arrived at through arm's length negotiations is usually the most reliable evidence of fair market value, *see* 5 *id.* at ¶ 132.2.1, although it is not invariably conclusive. It does not apply, for example, "where a transaction is based upon 'peculiar circumstances' which influence the pur-

---

amount of any tax imposed by this title shall be assessed within three years."); I.R.C. § 6671(a) ("penalties . . . *shall be assessed and collected in the same manner as taxes*"). We recently reject-

ed a similar contention in *Capozzi v. United States,* 980 F.2d 872 (2d Cir.1992), and need not discuss it here.

chaser to agree to a price in excess of the property's fair market value." *Bixby v. Commissioner*, 58 T.C. 757, 776, 1972 WL 2458 (1972) (citations omitted).

■ Appellants argue that the purchase prices of the Properties were arrived at through arm's-length negotiations and that those prices reflected as a matter of law the fair market value of each of the Properties. Appellants suggest that the jury would have so concluded had not the government's appraisal evidence been admitted and that that evidence was inadmissible. Citing language in a recent decision—"purchase as a result of arm's-length bargaining fixes fair market value; appraisal testimony arguably irrelevant," *Jacobson v. Commissioner*, 915 F.2d 832, 838 (2d Cir. 1990)—appellants contend that appraisal evidence may not be admitted when there is proof of arm's-length bargaining. We disagree.

First, the purported quotation from *Jacobson* has been ripped from its context. The following is the relevant passage:

As to the significance of a purchase price that approximates production cost, see *Evans [v. Commissioner]*, 908 F.2d [369,] 374 [ (8th Cir.1990) ]; *Siegel v. Commissioner*, 78 T.C. 659, 687–88 [1982 WL 11082] (1982); *Upham [v. Commissioner]*, 57 T.C.M. [ (CCH) 508,] 510, 513 [1989 WL 53834 (1988) ]; *Vandenhoff [v. Commissioner]*, 53 T.C.M. [ (CCH) 271,] 282 [1987 WL 40183 (1987) ]; *cf. Scheid v. Commissioner*, 50 T.C.M. (CCH) 663, 670 [1985 WL 15071] (1985) (*purchase as a result of arm's-length bargaining fixes fair market value; appraisal testimony arguably irrelevant* ).

*Jacobson*, 915 F.2d at 838 (emphasis added). What appellants label in their brief as a "holding" of *Jacobson* is actually a parenthetical description of a decision of the Tax Court. Nothing in *Jacobson*, therefore, supports the contention that appraisal evidence is inadmissible when there is evidence of arm's-length bargaining.

Second, common sense dictates that a rule rejecting appraisal evidence in such circumstances would be undesirable. The pertinent valuation should, like any question of fact, be determined on all available evidence, including evidence of the nature of the negotiations and expert appraisal evidence. Both kinds of evidence are relevant to the disputed valuation, and each reflects upon the reliability of the other. Appraisal evidence is thus relevant to whether the negotiations were truly arm's-length. If, after viewing all the evidence, including appraisal evidence, the trier determines that the negotiations were truly arm's-length and informed, it should accept the results of those negotiations as reflecting an accurate valuation. If it determines that the negotiations were not arm's-length and informed, then it may look to the appraisal evidence as evidence of value.

In the instant matter, the jury was free to find, and found, that the negotiations were not arm's-length. The special verdict sheet in the instant matter properly instructed the jury to consider whether there had been any gross valuation overstatements only after determining that the transactions were not at arm's length. The jury thus specifically found that the purchases of the Properties were not the result of arm's-length negotiations. This finding flowed logically from the totality of the evidence offered by the government, including the testimony and reports of the appraisers and the evidence concerning the various relationships and transactions.

An arm's-length transaction between a buyer and seller is one untainted by motives other than the desire of each to obtain the best price. The facts concerning this tax shelter, and inferences to be drawn from them, indicate that the purchases were dominated by other motives. Irving Cohen, in negotiating the purchase of the Properties, had strong incentives to agree to inflated prices in order to increase the tax benefits available to the limited partnerships. The acquisition agreements provided for small downpayments and relatively massive promissory notes. By labeling the notes recourse, Cohen insured that these debts would be included in computing the investment tax credit. In reality, however, the promissory notes were functionally identical to nonrecourse obligations. The Properties purchased with the notes

were pledged as security but, until twelve years after their execution, no payments were due on the notes except to the extent the Properties purchased realized net revenues. At the end of twelve years, the publishers could look only to the corporate assets of Townsend and Universal to collect amounts still owed on the notes. A trier could thus easily find that by then the corporate cupboards would be bare.

By structuring the purchases of the Properties in this fashion, Cohen created the appearance of substantial capital investments without a genuine risk of loss beyond the downpayments and the nonexistent assets of Townsend and Universal. The notes thus look like nonrecourse debt. Once the transactions were so understood by the jury, its conclusion that Cohen wanted to inflate the size of the promissory obligations—the larger the obligation, the greater the resulting investment tax credit—was inexorable. And, of course, the publishers had no incentive to resist such arrangements. The acquisition agreements guaranteed that any net revenues realized through the sale of the works produced from the Properties would eventually flow to the publishers, either immediately, or through payments to the service contractors. The publishers thus had absolutely nothing to lose as a result of these agreements. In sum, the transactions here were based upon the sort of "peculiar circumstances" that defeat any presumption that the purchase prices reflected the fair market values of each of the Properties. *See Bixby*, 58 T.C. at 775.

Alternatively, appellants contend that the actual appraisal reports and testimony were too subjective to be admissible. Once again, they look in vain to *Jacobson v. Commissioner* for support. In *Jacobson*, we reviewed a tax court decision that held, *inter alia*, that the acquisition of a movie by a limited partnership was a sham transaction that should be ignored for federal tax purposes. We reversed because the decision was based in part on the tax court's own subjective evaluation of the potential profitability of the movie. We stated that "[w]e reject this judicial version of the Siskel and Ebert 'thumbs up, thumbs down' approach to film evaluation.... [T]he court is not to reject profit motive because of subjective dislike of a film's style or disapproval of a film's theme. It is not for courts to predict what themes are geared to popular success." *Jacobson*, 915 F.2d at 839.

However, the jury in the instant matter was charged with determining the market value of the Properties, not the price they would as individuals have paid for the Properties. Given the nature of the jury's task, the government's expert testimony was clearly admissible. *See* Fed.R.Evid. 702.

■ Nor are we troubled by the fact that each of the appraisers' valuations of the Properties may contain an irreducible subjective element. The appraisal of any property that does not have frequently traded identical substitutes will necessarily be guided by both objective and subjective considerations. The four government appraisers were qualified as experts, and their valuations were grounded on their experience in the publishing industry and on objective factors such as the potential market for the book or software, the reputation of the author, and competition from other works. *See American Nat. Bank and Trust Co. v. K–Mart Corp.*, 717 F.2d 394, 399 (7th Cir.1983) ("Where ... the testimony of a qualified witness as to the value of property has a reasonable factual basis, it should not be ... excluded."). Appellants had ample opportunity during cross-examination to explore any subjective considerations underlying the experts' appraisals and to cast doubt on the reliability of those appraisals. *See United States v. 0.161 Acres of Land*, 837 F.2d 1036, 1040 (11th Cir.1988). Appellants were also free to argue to the jury that the appraisers' valuations were inherently unreliable because of subjective considerations. Finally, appellants offered the opinions of their own expert, who testified that the purchase prices were reasonable. The jury, adequately instructed on the weight to accord expert testimony, was thus in a position to balance the competing opinions and to de-

termine the actual values of the Properties on an informed basis.

### 2. Amount of the Penalty

Under the version of Section 6700 in effect at the time of the relevant transactions, a person found liable for organizing or promoting abusive tax shelters had to "pay a penalty equal to the greater of $1,000 or 10 percent of the gross income derived or to be derived by such person from such activity." I.R.C. § 6700. In determining the penalty owed by each appellant, Chief Judge Platt assigned appellants the burden of proving any error in the July 1989 assessments. *In re Tax Refund Litigation,* 766 F.Supp. at 1253–55. Chief Judge Platt considered appellants' numerous objections to the government's assessments, rejecting all but two objections raised by Belloff and Gold. All appellants except Madison, as well as the government, challenge his decision on a number of grounds.

### a. *Assessment on an Annualized Basis*

Appellants Barrister Associates, Chadwick, Belloff, Gold, Universal, and Townsend argue that the government must assess the Section 6700 penalty with reference to a discrete taxable year and only on income actually earned during that year. For simplicity, we will examine the specifics of this argument with regard to Barrister Associates, although our conclusions apply to all appellants.

In its 1989 assessment against Barrister Associates, the government allocated the $534,692.50 penalty between 1982 and 1983, with $215,255 assigned to 1982, and the remaining $319,437.50 to 1983. The portion of the penalty assessed for 1982 was based on all of the general partnership fees attributable to the thirty-five Barrister Equipment Associates limited partnerships promoted in 1982, regardless of whether

those fees were actually received in 1982. The same method was used to compute the 1983 portion of the penalty. *See In re Tax Refund Litigation,* 766 F.Supp. at 1258–59. However, when the district court entered its judgment, it simply found Barrister Associates liable for the entire $534,692.50, without reference to particular taxable years.

In assessing the penalty against Barrister Associates, the government assigned to a particular year all of the income attributable to the limited partnerships promoted during that year, whether or not the income was actually earned in that year. The district court approved this technique. *Id.* Barrister Associates argues that this violates I.R.C. § 6671(a), which provides that "penalties and liabilities provided by this subchapter [which includes I.R.C. § 6700] ... shall be assessed and collected in the same manner as taxes." Taxes, Barrister Associates correctly notes, are assessed annually, with reference to a particular calendar period. *Cf.* 26 C.F.R. § 301.6203–1 (1991) (summary record of tax assessment shall identify, *inter alia,* "the taxable period, if applicable"). Barrister Associates concludes that the Section 6700 penalty must also be assessed with reference to a taxable period.

In determining the penalty owed for 1982, Barrister Associates argues, the government should have looked only to the limited partnership fees (and other income) Barrister Associates actually received in 1982. Money earned in later years could be considered only when (and if) the government assessed a penalty for those years. Under the rule suggested by Barrister Associates, therefore, the government would have to divide a Section 6700 penalty assessment into discrete taxable periods, and, in computing the penalty for each period, consider only gross income actually earned during that period. We disagree.[2]

---

**2.** As a practical matter, the resolution of this issue might have no real effect except perhaps to complicate IRS efforts to penalize organizers and promoters of abusive tax shelters. No statute of limitation applies to the government's assessment of a Section 6700 penalty, *see supra*

Note 1, and the government is thus free to assess a penalty against a promoter of an abusive tax shelter at any time.

If we agreed that an assessment may only be made with regard to income earned during a discrete taxable period, we would have to re-

█ The plain language of the statute is contrary to Barrister Associates' argument. In enacting Section 6700, Congress expressly authorized the IRS to assess a penalty on future income, that is, on income "to be derived" from the promotion of an abusive tax shelter. I.R.C. § 6700; *see* S.Rep. No. 494, 97th Cong., 2d Sess. 248 (1982), *reprinted in* 1982 U.S.C.C.A.N. 781, 1015 ("In determining the penalty with respect to the amount of gross income *yet to be derived from an activity*, the Secretary may look only to unrealized amounts which the promoter or other person may reasonably expect to realize.") (emphasis added). A holding that the government could assess a penalty only on income actually earned would disregard Congress's unambiguous direction that the penalty be imposed on future earnings. We cannot ignore their unambiguous language. *See, e.g., Connecticut Nat'l Bank v. Germain,* —— U.S. ——, ——, 112 S.Ct. 1146, 1149, 117 L.Ed.2d 391 (1992).

The Internal Revenue Code thus does not obligate the IRS to assess Section 6700 penalties only on income actually earned during discrete taxable periods. Unlike the assessment of, for example, a tax deficiency, *see* I.R.C. §§ 6211–6216, which is directly tied to the payment of a particular tax owed in a particular taxable period, the assessment of a Section 6700 penalty turns on income earned from specific conduct— the organization or promotion of an abusive tax shelter—that may occur at times different from those in which income is actually realized. This is in contrast to other Internal Revenue Code penalties, which depend on whether, and how often, an individual avoids certain tax obligations arising in a particular taxable period. *See, e.g.,* I.R.C. § 6704 (civil penalty for failing to keep certain records; penalty "for any

calendar year shall be $50, multiplied by the number of individuals with respect to whom such failure occurs in such year"); I.R.C. § 6723 (person who fails to include correct information on an information return shall pay a penalty for each failure). Other circuits have similarly found that Section 6700 penalties need not be assessed with reference to a discrete taxable period. *See Sage v. United States,* 908 F.2d 18, 22 (5th Cir.1990); *Planned Invs. Inc. v. United States,* 881 F.2d 340, 344 (6th Cir.1989); *Gates v. United States,* 874 F.2d 584, 588 (8th Cir.1989). *But see Bond v. United States,* 872 F.2d 898, 901 (9th Cir.1989) (dicta that Section 6700 penalties should be assessed on an annualized basis).

Barrister Associates argues, however, that, because the practical difficulties in assessing the penalty without reference to discrete taxable periods are so great, this construction of Section 6700 "reads [the section] out of the Internal Revenue Code." The argument underlying this bit of hyperbole is that: income, whether subject to a tax or a penalty, can only be measured by reference to some time period. If this "temporal dimension" is ignored, it becomes impossible to measure and tax or penalize income in any rational manner. The government thus collects taxes on an annual and retrospective basis because of the intractable problem of predicting with accuracy the individual future incomes of millions of taxpayers.

However, the instant matter raises issues of a less intractable dimension. For purposes of calculating a Section 6700 penalty, the government is concerned only with gross income to be derived from a particular, well-defined activity. With regard to such an activity, it is far less daunt-

mand the instant matter with directions to eliminate from the penalties assessed amounts not attributable to money earned during 1982 or 1983. The government could then assess an additional penalty against Barrister Associates based on income earned after 1983. In the end, Barrister Associates might have to pay at least the same total penalty already reflected in the district court's judgment. In fact, because of a 1984 amendment to Section 6700, which increased the penalty to twenty percent of gross

income, *see* Tax Reform Act of 1984, Pub.L. No. 98–369; § 143(a), 98 Stat. 494, 682 (1984); *see also Gang v. United States,* 783 F.Supp. 376, 379– 81 (N.D.Ill.1992) (holding that twenty-percent penalty applies to all income earned after effective date of 1984 amendment), Barrister Associates could potentially be liable for a larger penalty than the one already assessed, depending on when it actually received its post–1983 income.

ing to predict future earnings, at least those earnings that a person "may reasonably expect to realize." S.Rep. No. 494, 97th Cong., 2d Sess. 267, 1982 U.S.C.C.A.N. p. 1015. We therefore see no practical obstacles to assessing the penalty on income expected in later years.

### b. *Inclusion of Earnings Expected but Never Received in Gross Income Base*

Barrister Associates argues that the district court should not have allowed the government to consider, in assessing the penalty against Barrister Associates, limited partners' fees never actually paid to Barrister Associates by certain of the limited partnerships. Again, we disagree.

█ Section 6700 allows the government to assess a penalty on "gross income derived or to be derived" from the tax shelter activity. As noted, this language contemplates assessments on earnings to be derived in the future from the promotion of an abusive tax shelter. But "[i]n determining the penalty with respect to the amount of gross income yet to be derived from an activity, the [government] r.ay look only to unrealized amounts which the promoter or other person may reasonably expect to realize." S.Rep. No. 494 at 267, 1982 U.S.C.C.A.N. at 1015.

In the instant matter, the only income Barrister Associates earned from the tax shelter promotion was the one-time general partner's fees owed it by each of the limited partnerships. With the exception of $28,750 still owed by three of the limited partnerships, Barrister Associates had received all of these fees by 1986. Thus, at issue is whether this $28,750 was unrealized income that Barrister Associates could have "reasonably expect[ed] to realize" when the government first assessed the penalty in 1986.[3] We believe that the answer is yes.

As the district court noted, at the time of the first assessment, Barrister Associates could have brought suit to recover the unpaid fees from the defaulting limited partnerships. While, with the benefit of hindsight, we now know (and indeed the government knew in 1989) that a lawsuit to recover those fees was necessary but never pursued, this fact does not make consideration of the $28,750 improper. The burden was on appellants to show that the fees would not have been recoverable through such a lawsuit. Absent such a showing, the government was entitled to take the $28,750 into account.

### c. *Liability of Barrister Associates for Fees Received From Limited Partnerships of Which it was Not the General Partner*

Barrister Associates next contends that the penalty assessment should not have

---

3. When the government first assessed a penalty on Barrister Associates in 1986, it assessed the penalty on a $1000 per each separate tax shelter transaction basis. In granting the motion for partial summary judgment, the district court held that this method was improper and that the $1000 penalty is to be used only when ten percent of the gross income from all transactions is less than $1000. *In re Tax Refund Litigation,* 698 F.Supp. at 443. Because ten percent of Barrister Associates' income from the tax shelter promotion exceeded $1000, the district ordered the government to reassess the penalty using the gross income method. Thus, it was only in the subsequent 1989 assessment that Barrister Associates' gross income became relevant.

However, for purposes of determining the proper amount of that assessment, the government had to evaluate Barrister Associates' actual and expected gross income as if it were still 1986. In other words, in computing the penalty, the government could consider the full amount of any income already received as of 1986, and the 1986 present value of any income expected to be realized after 1986. This is because interest on the unpaid portion of the 1989 assessment accrued from the time of the first assessment in 1986, at least to the extent the amount of the 1989 assessment was less then or equal to the amount of the 1986 assessment. And, therefore, if the government were permitted to make its assessment using the full value of all income Barrister Associates realized as of 1989, and it were also allowed to calculate interest on this assessment from 1986, Barrister Associates would pay double interest on post–1986 income. Of course, to the extent any income actually received by 1989 could not have been anticipated in 1986, the government could issue a new assessment against Barrister Associates, but interest would accrue only from the date of this new assessment.

been based on $125,000 in general partner's fees attributed to Barrister Equipment Associates Series 122 and 129, because Barrister Associates was not the general partner of those two limited partnerships and thus did not receive income from them. According to Barrister Associates, another entity, Barrister Associates, Inc., which is not a party to the present action, acted as general partner of the two partnerships and received the general partner's fees from those limited partnerships. Thus, Barrister Associates concludes, the $125,000 in revenues should have been excluded from the assessment against it.

Because the district judge concluded that this issue related to the amount of the penalty, rather than to Barrister Associates' liability as a promoter of abusive tax shelters, he held that Barrister Associates bore the burden of proving that it did not receive the general partner's fees in question. *See In re Tax Refund Litigation,* 766 F.Supp. at 1259–60. Barrister Associates takes issue with this allocation of the burden of proof, and argues that, because this question concerns Barrister Associates' liability for organizing and promoting Barrister Equipment Associates Series 122 and 129, the government had to prove Barrister Associates received the pertinent general partner's fees by clear and convincing evidence.[4] We disagree.

▇▇ Had this matter been tried with regard to each limited partnership, we might well be inclined to find this issue to be one of liability rather than damages. However, under the procedural ground rules agreed to by the parties, the government had no obligation to prove that Barrister Associates, or any of the other appellants, had violated Section 6700 with respect to the organization and promotion of each of the ninety-five limited partnerships. Rather, the government had to show only

that Barrister Associates had engaged in activities prohibited by Section 6700 with respect to any of the six representative limited partnerships, which did not include either Series 122 or 129. All remaining questions went to the size of the penalty, and the government was entitled to a presumption that its assessment of the penalties was correct. *See Welch v. Helvering,* 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L.Ed. 212 (1933). Barrister Associates thus had the burden of proving that it was not the general partner of Barrister Equipment Associates Series 122 and 129.

The district court found that Barrister Associates had not met this burden. *In re Tax Refund Litigation,* 766 F.Supp. at 1259–60. This finding was not clearly erroneous. *See* Fed.R.Civ.P. 52(b). Specifically, the court relied on Form 1065 partnership tax returns and the attached Schedules K–1 filed by the two limited partnerships for the fiscal years ending October 31, 1983 and October 31, 1984, that indicated that the general partner of the two limited partnerships was itself a partnership called either Barrister Associates or Barrister Associates, Inc. The court also relied on the fact the lease agreements and service agreements entered into by the two limited partnerships were signed "Paul Belloff, General Partner of Barrister Associates, the General Partner." *See In re Tax Refund Litigation,* 766 F.Supp. at 1259–60. Barrister Associates does not dispute the content of these documents but argues that they were not admitted into evidence. Again, we disagree.

Appellants signed a pretrial order stipulating to the authenticity of these documents and their admissibility, reserving only the right to object under Fed.R.Evid. 403. Appellants do make an argument based on Rule 403, and we perceive no

4. No party challenges on appeal the district court's allocation of the burdens of proof, *i.e.,* that the government had to prove liability by clear and convincing evidence and appellants had to prove the assessments were improper by a preponderance of the evidence. We express no opinion on whether this allocation was correct but note that other courts have held that the government need prove liability only by a pre-

ponderance of the evidence. *See Weir v. United States,* 716 F.Supp. 574, 577 (N.D.Ala.1989); *American Technology Resources v. United States,* 709 F.Supp. 610, 617 (E.D.Pa.1989), *aff'd,* 893 F.2d 651 (3d Cir.), *cert. denied,* 495 U.S. 933, 110 S.Ct. 2176, 109 L.Ed.2d 505 (1990); *United States v. Music Masters Ltd.,* 621 F.Supp. 1046, 1053–54 (W.D.N.C.1985), *aff'd,* 816 F.2d 674 (4th Cir.1987).

prejudice to appellants from Chief Judge Platt's deeming them to be part of the record.

### d. *Inclusion in Gross Income of Cost of Sales and Goods*

Chadwick argues that money it paid in commissions to sales representatives who sold interests in the limited partnerships should have been excluded from the gross income base of the penalty assessed against Chadwick. Similarly, Townsend and Universal contend that the cash portion of the purchase prices of the Properties should have been excluded from the gross income base of the penalties assessed against them. Their arguments are meritless.

 Unless an exclusion is specifically provided, gross income is "all income from whatever source derived, including (but not limited to) the following items: (1) Compensation for services, including fees, commissions, and similar items; ... (5) rents." I.R.C. § 61(a). All of the income Chadwick derived from the tax shelter promotion was in the form of sales commissions from the limited partnerships, an item expressly included in gross income. Chadwick cites no Internal Revenue Code provision that authorizes an exclusion from gross income for commissions it paid to sales representatives. The district court thus did not err in failing to deduct from Chadwick's gross income base the amount of the commissions paid. As to Townsend and Universal, the income they derived from the tax shelter program was in the form of rent payments from the limited partnerships. Such payments are also expressly listed as a form of gross income. *Id.* Because the Internal Revenue Code does not provide an exclusion from gross income for the cost of leased goods, the district court correctly declined to grant a reduction equal to the cash downpayments made on the Properties from Townsend's and Universal's gross income.

### e. *Imposition of a Penalty on Both a Partnership and its Partners*

 The district court excluded earnings Belloff and Gold had received from Barrister Associates from the gross income base of the assessments against them. *In re Tax Refund Litigation*, 766 F.Supp. at 1255–57. Chief Judge Platt reasoned that Belloff and Gold were the general partners of Barrister Associates, and they were personally liable under New York law for the Section 6700 penalty assessed against the partnership. N.Y. Partnership Law §§ 24, 26 (McKinney 1988). Moreover, Barrister Associates was liable for any penalty assessed against Belloff or Gold as a result of actions taken within the scope of their authority as general partners, including the promotion of the tax shelter program at issue here. *Id.* Chief Judge Platt concluded that imposing a penalty on Belloff and Gold based on gross income they derived from Barrister Associates, and, at the same time, imposing a penalty on Barrister Associates based on that same income, would constitute a double tax not authorized by Congress. *See United States v. Hemme*, 476 U.S. 558, 572, 106 S.Ct. 2071, 2079, 90 L.Ed.2d 538 (1986) (double tax permissible only if clearly intended by Congress).

In its cross-appeal, the government argues that this was error. It points out that a Section 6700 penalty may be assessed against "any person" who promotes or organizes an abusive tax shelter. I.R.C. § 6700. A partnership and its individual partners are both persons for purposes of the Internal Revenue Code. *See* I.R.C. § 7701(a)(1) (definition of "person"). Had a non-partner of the partnership engaged in conduct within the scope of his or her authority that violated Section 6700, both the agent and the partnership could be penalized on any income earned as a result of that conduct. The government thus argues that, because the jury found that Gold, Belloff, and Barrister Associates had engaged in conduct subject to a penalty under Section 6700, all three should be held accountable to the full extent of any income derived from their tax shelter activity. The question is a close one, but we disagree.

The government's agent scenario is different from the situation here. It is true

that an agent who promotes abusive tax shelters on behalf of a partnership is subject to a penalty based on the agent's earnings derived from that conduct, as is the partnership. Unlike the instant case, however, income to the partnership is not income to the agent, and an agent of the partnership has no obligation to pay the partnership's penalty. The agent is thus not double-taxed by a penalty. On the other hand, debts of the partnership are debts of the partners, and income to the partnership is income to the partners. Indeed, partnerships and individual proprietorships are generally not taxable entities, *see* I.R.C. § 701, presumably to avoid double taxation of owners who do not have unlimited liability. Absent a clear direction from the Congress, we follow that logic here and agree with Chief Judge Platt.[5]

### f. Transfer of Ownership of Chadwick

■ Finally, the government contends that the district court should not have excluded roughly $200,000 from the gross income base of the penalties assessed against Belloff and Gold. This was income each purportedly derived from Chadwick during 1984. Belloff and Gold were both one-third shareholders of Chadwick. At the end of 1983, after receiving notification that the government was investigating their activities and at the request of the third shareholder, Ronald Cohen, Belloff, and Gold transferred their interests in Chadwick to their respective wives. A portion of the sales commissions owed to Chadwick by the 1983 limited partnerships was not received until 1984, after the transfer. A portion of that 1984 income went to the wives of Belloff and Gold, namely in the form of cash withdrawals and Keogh Plan contributions. The district court held that this income, received by the wives of Belloff and Gold after the transfer, should not be included in the gross income base of

the penalties assessed against Belloff and Gold. *In re Tax Refund Litigation,* 766 F.Supp. at 1258.

The government argues, however, that Belloff and Gold bore the burden of proving that the income in question was not expected to be derived by them and failed to carry that burden. We agree. Belloff and Gold were clearly trying to diminish the penalty by transferring their interest in Chadwick to their wives. We do not believe that this transfer, without more, demonstrates that their interest in the future income has in fact been eliminated, even assuming the doubtful proposition that a genuine transfer without consideration might be recognized for these purposes. Certainly, any other rule might vitiate the effect of the penalties intended by Congress.

Affirmed on the appeal; affirmed in part and reversed in part on the cross-appeal.

---

5. The government also contrasts the instant situation with the case of a corporation and its culpable shareholders. Specifically, it points to the district court's ruling that Gold and Belloff were both liable to pay a penalty based on income each received from Chadwick, a subchapter S corporation, even though Chadwick was also liable for a penalty based in part on the same income. But again, the government's argument fails to recognize that the obligation to pay these penalties does not fall upon the same individuals. Chadwick bears no responsibility for penalties imposed on its shareholders, and, while the value of Belloff's and Gold's stock in Chadwick will undoubtedly diminish because of Chadwick's penalty, Belloff and Gold are not personally liable for that penalty.